RECEIPT # 62 5482 Case 1:05-cv-11097-WGY    Document 1    Filed 05/25/2005    Page 1 of 2
AMOUNT $ 250
SUMMONS ISSUED
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK. ____
DATE 5-26-05

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CAROLYN PIMENTAL *formerly known as*  )
CAROLYN IGOE,                          )
                    Plaintiff,         )
                                       )
v.                                     )
                                       )    CIVIL ACTION NO.
WACHOVIA MORTGAGE CORPORATION          )
*formerly known as* FIRST UNION MORTGAGE )
CORPORATION                            )
                    Defendant.         )

# 05 - 11097 WGY

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1441 and 1446, Defendant Wachovia Mortgage Corporation MAGISTRATE JUDGE _Collings_

("Wachovia"), hereby submits this Notice of Removal of this matter to the United States District

Court for the District of Massachusetts, and states as follows:

1.    State Court Action

The Plaintiff, Carolyn Pimental ("Mrs. Pimental") filed this action against the Defendant

in the Superior Court of Massachusetts for Suffolk County, Civil Action No. 2005-00970-H. (A

copy of the Plaintiff's First Amended Complaint is attached hereto as Exhibit A).

2.    Federal Jurisdiction

Mrs. Pimental is a resident of the Commonwealth of Massachusetts. (Complaint ¶1). The

Defendant, Wachovia, is a foreign entity with a principle place of business in Jacksonville,

Florida. (Complaint ¶2). The Complaint asserts claims for breach of contract, negligence and

violation of M.G.L. c.93A. Mrs. Pimental claims to have sustained damages amounting to at

least $173,345.41. Consequently, this Court has original jurisdiction over this matter under the

provisions of 28 U.S.C. § 1332 (a), and this matter is properly removable to this Court under the

provisions of 28 U.S.C. § 1441.

3.    Timeliness of Notice of Removal

The Defendant first received notice of this action by service of the First Amended

Complaint and Jury Claim, on May 19, 2005.  Removal of this action is, therefore, timely under

28 U.S.C. § 1446(b).

4.    Relief Requested

The Defendant requests that the United States District Court for the District of

Massachusetts assume jurisdiction over the above-captioned action and issue such further orders

and processes as may be necessary to bring before it all parties necessary for trial on this action.

> WACHOVIA MORTGAGE
> CORPORATION
>
> By its attorneys,

Dated: May 25, 2005

Donald E. Frechette (BBO # 547293)
Nicholas J. Rosenberg (BBO #657887)
Edwards & Angell, LLP
101 Federal Street
Boston, Massachusetts  02110
Tel:  (617) 439-4444
Fax:  (617) 439-4170

## CERTIFICATE OF SERVICE

I hereby certify that on this 25 day of May, 2002, I caused a copy of the foregoing via
first-class mail to John H. Malloy, 385 Broadway, Suite 402, Revere, MA 02151.

Nicholas J. Rosenberg

BOS_490128_1/NROSENBERG



# CHAMPION HOMES USA

## *SIMPLY THE BEST*

## *SALES AGREEMENT & DEPOSIT RECEIPT*

This Agreement made this 23ᴿᴰ day of ___MAY, 2001___ between Champion Homes ᴴ *RVP*
USA hereinafter known as the CONTRACTOR, and _Carolyn Igoe_
_3 Porter Ave_ of _Revere MA 02151_ hereinafter known as the
PURCHASER.

## *THE FOLLOWING WORK TO BE DONE BY THE CONTRACTOR*
### *Basic Price*    $ 175, 000, ˣˣ

| *Factory* | | *Extra Work* | |
|---|---|---|---|
| *ADDITIONS* | | *CONTRACTOR* | |
| Delivery | | First Total | 175, 000, ˣˣ |
| Crane | | *CONTRACTOR*Extras | |
| Total | 175, 000, ˣˣ | Second Total | |
| | | Sales Tax | 1, 365, ˣˣ |
| | | *GRAND TOTAL* | 176, 365, ˣˣ |
| | | Down Payment Received | 5, 000. ˣˣ |
| | | *BALANCE DUE* | 171, 365, ˣˣ |

The Undersigned Champion Homes USA hereinafter referred to as the CONTRACTOR
agrees to sell and by these presents does sell, subject to the conditions herein described as
PURCHASER, agrees to buy Champion Homes USA as computed above, for the Grand
Total as designated above. Plans, Specifications, Order Analysis and Responsibilities of
PURCHASER in the hands of both parties to this Agreement, hereby incorporated into
this Sales Agreement by reference. The PURCHASER agrees to pay per the following
payment schedule (see attached payment schedule sheet for a more detailed explanation).

| 15% | Deposit | 26, 150, ˣˣ less 5,000, ˣˣ= 21, 150 |
|---|---|---|
| 10% | Foundation Complete | 17, 636. ˣˣ |
| 55% | House Delivery | 97, 000, ˣˣ |
| 10% | Button-Up Complete | 17, 636. ˣˣ |
| 5% | Plaster & Paint | 8, 828. ˣˣ |
| 5% | Carpet & Occupancy | 8, 815. ˣˣ |

The PURCHASER in signing this Agreement authorizes the Lender of construction money or the Mortgagee to make payments to the CONTRACTOR according to the terms and amounts of the Agreement and deduct same from commitment amount. The CONTRACTOR shall have the right to delay shipment beyond the scheduled date if in his judgment the building site or the foundation is not ready to receive Champion Homes USA. The CONTRACTOR is not liable for any delays in filling this order caused by interruption of transportation facilities, fires, floods, explosions, riots, strikes or any contingencies beyond its control. The CONTRACTOR reserves the right to amend the selling price when it is not in accord with his current price list or an arithmetical error is detected.

Whenever the CONTRACTOR makes any change in its standard specification to comply with the local building code, the cost of material, labor or service shall be borne by the PURCHASER. The CONTRACTOR reserves the right to substitute materials of equal quality for any herein specified in order to expedite delivery or completion of the Agreement.

Dwelling shall be constructed according to Champion Homes USA general specifications.

No representation implied or expressed made by an employee, agent or Officer of the CONTRACTOR shall be binding upon the CONTRACTOR unless said representation or warranty is in writing and written acceptance of same is made by the CONTRACTOR'S corporate Director.

This Agreement states the entire agreement of the parties, and the CONTRACTOR shall not be bound by any oral representations, sales literature and/or other informal agreements. It shall be the Owner's responsibility to pay for all necessary building permits, variances, and any other licenses or other permissions to have said building placed on said lot. The CONTRACTOR shall have the right to assume that it is lawful for him to place said building on the Owner's land unless he is notified to the contrary. If said notification is received at any time during the existence of the Contract, the Owner shall be responsible to pay the CONTRACTOR compensations for labor, materials, transportation, loss of profit and any fines, and any and all other expenses which the CONTRACTOR may have suffered by reason of the Owner's neglect or refusal to obtain any of said necessary permits, licenses, or the like, or his failure to comply with any building or zoning rules or regulations.

The Owner agrees that it shall be his sole responsibility to determine the location on his premises of the foundation of the proposed structure and to ascertain that said location is in conformity with the building code and zoning laws of the locale in which said land is situated and the Owner shall inform the foundation crew of said locations. If the location determined by the Owner is in violation of the building code or if the Owner fails to inform the foundation crew of said location and the foundation crew determines the location themselves and said location is in violation of the building code and shall not be in the exact location desired by the Owner, then the cost of all necessary corrections including fines shall be borne the Owner. The CONTRACTOR specifically disclaims any responsibility for the suitability of the Owner's site or the erection of the building described herein and assumes no responsibility in determining existence of any subterranean conditions effecting the erection thereon of said building. The Owner agrees to make test borings if, in his discretion, he deems them necessary.

2

The CONTRACTOR shall not be liable for any damage to plants, shrubbery's, lawns, fences or other ornamental or decorative appurtenances within a thirty foot area necessary for the activity of the workmen or their equipment, in the execution of their work. The CONTRACTOR shall not be responsible for any landscaping or finish grading around the building and shall not be responsible for the removal of excavated earth or debris from the property, or debris from construction. It is agreed that title to all materials, supplies and the building furnished under this Agreement shall remain the property of the CONTRACTOR and shall be deemed and considered as personal property until all payments required hereunder shall have been made in full. This Agreement shall be governed by the laws of the State of Massachusetts_____.

All deposits by Purchaser will be the property of the CONTRACTOR unless PURCHASER'S financing is not approved.

If for any reason this becomes a collection situation, all legal and collection fees will be borne by the PURCHASER. The prices quoted herein are guaranteed for 30 days.

_____

ADDITIONAL PROVISIONS:

_____
_____
_____
_____
_____
_____

IN WITNESS WHEREOF, This Agreement has been executed and accepted on this _____
day of _____, 2001.

By _____
              Purchaser

_____
              Purchaser

Accepted by _____
              Salesman, Champion Homes USA

Accepted by _____
              Corporate Director, Champion Homes USA

3





# CHAMPION HOMES USA

## A DIVISION OF CANADIAN HOMES USA * SIMPLY THE BEST

170 000
1365 + tax
171 365

## PAYMENT SCHEDULE

| | | |
|---|---|---|
| 15% | DEPOSIT | ORDER HOUSE |
| | 25700 over 406 Paid — 5000 (20 700) aug 21/00 CF. | |
| 10% | FOUNDATION COMPLETE | EXCAVATE, POUR FOOTING, FOUNDATION & STRIP WALLS, PLUS ANY FOUNDATION EXTRAS |
| | 17140 1540 PP CI get 16315 | |
| 55% | HOUSE DELIVERY | CERTIFIED CHECK DUE WHEN HOUSE ARRIVES, PLUS ANY PLAN MODIFICATION EXTRAS |
| | 94250 9235 PP CI get 93,569 | |
| 10% | BUTTON-UP COMPLETE | WEATHER TIGHT, ROUGH HEAT, ROUGH ELECTRIC, ROUGH PLUMBING, FOUNDATION BACKFILLED & PROPERTY ROUGH GRADED |
| | 17140 16140 PP CI | |
| 5% | PLASTER & PAINT | PLASTER COAT, PAINT INSIDE, INSTALLSTEPS & SLAB IN BASEMENT POURED |
| | 8570 | |
| 5% | CARPET & OCCUPANCY | CARPET, FINISH ALL FLOORS, FINISH HEAT, ELECTRIC, PLUMBING, & OCCUPANCY PERMIT |
| | 8565 | |

Carolyn Dove   8/01/01

Return to:
Carolyn Igoe
3 Porter Avenue
Revere, MA  02151

BK 3 3 4 6 9 PG 2 5 3



## QUITCLAIM DEED

I, Charles R. Cooke, individually, of 88 Perkins Row, Topsfield, Essex County, Massachusetts, for consideration of $115,170.00, One Hundred Fifteen Thousand, One Hundred Seventy dollars paid, grant to Carolyn Igoe of 3 Porter Avenue, Revere, Suffolk County, Massachusetts with **QUITCLAIM COVENANTS,**

the land in Everett, Middlesex County, with the building(s) thereon, if any.

Being Lot 84 and one-half (1/2) of Lot 83 on a plan of land made by Charles A. Pearson entitled Washington Park, plan of building lots in Everett and Chelsea owned by J.K. Litchfield, E.F. Chaffee and C.H. Porter, dated April 12, 1892 and filed in Middlesex South District Registry of Deeds, Plan Book 74, Plan 12, and described as follows: Lot 84 and one-half of Lot 83 bounded --

| | |
|---|---|
| NORTHEASTERLY | by Madison Avenue, forty-five (45) feet; |
| NORTHWESTERLY | by Spruce Street, eighty (80) feet; |
| SOUTHWESTERLY | by Lot numbered 90 and part of lot numbered 91 on said plan, forty-five (45) feet; and |
| SOUTHEASTERLY | by other land formerly of E.F. Chaffee et al, eighty (80) feet. |

Being a portion of the premises conveyed by Charles R. Cooke and Joan A. Smith to Viola E. Cooke by deed dated December 16, 1971, and recorded in Middlesex South District Deeds, Book 12127, Page 463.

For Grantor's title see Estate of Viola E. Cooke, Essex Probate and Family Court Docket No. 00P1740-EP1 and see deed of Joan A. Smith recorded immediately prior hereto. See also deed recorded with Middlesex South District Registry of Deeds in Book 32049, Page 8.

WITNESS my hand and seal this _16th_ day of August, 2001

_Charles R. Cooke_

08/17/01  2:13PM    01
000000 #5469

FEE        $526.68

COPY      $526.68

CAMBRIDGE
DEEDS REGIS
MIDLE SOUTH

BK33469PG254

Quitclaim Deed
Page Two

## THE COMMONWEALTH OF MASSACHUSETTS

Middlesex, SS.                                    August /_6_, 2001

Then personally appeared the above named Charles R. Cooke, and acknowledged the
foregoing instrument to be her free act and deed, before me.

Notary Public
My Commission Expires: 2/16/07

James J. Burke
NOTARY PUBLIC
My commission expires Feb. 16, 2007

BK33469PG255



After Recording Please Return To
Construction Lending Department
First Union Mortgage Corporation
214 N. Hogan Street, 8th Floor
Jacksonville, FL 32202

_____Space above this line for Recording Data_____ _____

# MORTGAGE DEED

**DEFINITIONS**
Words used in multiple sections of this document are defined below and other words are defined in Sections 3,
11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in
Section 16.

**(A) "Security Instrument"** means this document, which is dated          **August 16, 2001** , together
with all Riders to this document.
**(B) "Borrower"** is

### CAROLYN IGOE

Borrower is the mortgagor under this Security Instrument.

**(C) "Lender"** is **FIRST UNION MORTGAGE CORPORATION,** . Lender is a corporation
organized and existing under the laws of North Carolina . Lender's address is 1100 Corporate Center Drive,
Raleigh, North Carolina 27607-5066 . Lender is the mortgagee under this Security Instrument.

**(D) "Note"** means the promissory note signed by Borrower and dated        **August 16, 2001** . The Note
states that Borrower owes Lender

### TWO HUNDRED SIXTY THOUSAND ONE HUNDRED & 00/100's

Dollars (U.S. $    **260,100.00**    ) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than        **September 1, 2031** .
**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due
under the Note, and all sums due under this Security Instrument, plus interest.
**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Trust Rider |
| ☐ 1-4 Family Rider | ☐ Biweekly Payment Rider | ☐ V. A. Rider |
| ☐ Fixed/Adjustable Rider | ☒ Other(s) [specify]    LEGAL DESCRIPTION and | |

CONSTRUCTION RIDER TO NOTE AND SECURITY INSTRUMENT

**MASSACHUSETTS** - Single Family - Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**   Initials_____
Page  1  of 15                        7289805                        Form 3022   1/01

BK33469PG256

(H) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(I) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(J) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K) **"Escrow Items"** means those items that are described in Section 3.

(L) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(M) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(N) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

### TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, with power of sale the following described property located in the
         County                    of          **Middlesex**         .

     [Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]

**MASSACHUSETTS** - Single Family - Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**   Initials_____
Page  2  of 15                                  7289805                          Form 3022   1/01

BK 33469 PG 257

SEE LEGAL DESCRIPTION ATTACHED

which currently has the address of

**84 Madison Avenue, Everett, Massachusetts 02149**

("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not

BK33469PG258

do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

BK33469PG259

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also

## BK33469PG260

be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender

BK 3 3 4 6 9 PG 2 6 1

otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender' s interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason,

BK 33469PG262

the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture.  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

MASSACHUSETTS - Single Family - Fannie Mae/Freddie Mac  UNIFORM INSTRUMENT   Initials_____
Page  8  of 15                                        7289805                        Form 3022  1/01

BK33469PG263

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower

BK 3 3 4 6 9 PG 2 6 4

or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been

BK 33469PG265

given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b ) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and

MASSACHUSETTS - Single Family - Fannie Mae/Freddie Mac  **UNIFORM INSTRUMENT**   Initials_____
Page  11  of 15                                    7289805                              Form  3022   1/01

BK 3 3 4 6 9 PG 2 6 6

obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

     **20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

     Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

     **21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

     Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

     Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance

BK33469PG267

affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law, in the manner provided by Applicable Law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

BK 33469 PG 268

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____    _____(Seal)
                                    CAROLYN  IGOE                    Borrower

                                    _____(Seal)
                                                                    Borrower

                                    _____(Seal)
                                                                    Borrower

                                    _____(Seal)
                                                                    Borrower

# BK33469PG269

_____Space below this line for Acknowledgement_____

**COMMONWEALTH OF MASSACHUSETTS,** Middlesex      **County   ss:**

On this   16th day of      August                        , 200 1, before me personally appeared

**CAROLYN  IGOE**

known to be the person(s) described in and who executed the foregoing instrument, and acknowledged that he/she/they executed the same as his/her/their free act and deed.

My Commission Expires:  $2 \mid \mid 6 \mid 9$

_____
Notary Public

James J. Burke
NOTARY PUBLIC
My commission expires Feb. 15, 2009

BK33469PG270

## Exhibit A - Property Description

**Closing date:**    08/16/2001

**Borrower(s):**    Carolyn Igoe

**Property
Address:**    84 Madison Avenue, Everett, Massachusetts 02149

Being Lot 84 and one-half (1/2) of Lot 83 on a plan of land made by Charles A. Pearson entitled Washington Park, plan of building lots in Everett and Chelsea owned by J.K. Litchfield, E.F. Chaffee and C.H. Porter, dated April 12, 1892 and filed in Middlesex South District Registry of Deeds, Plan Book 74, Plan 12, and described as follows: Lot 84 and one-half of Lot 83 bounded -

NORTHEASTERLY    by Madison Avenue, forty-five (45) feet;

NORTHWESTERLY    by Spruce Street, eighty (80) feet;

SOUTHWESTERLY    by Lot numbered 90 and part of lot numbered 91 on said plan, forty-five (45) feet; and

SOUTHEASTERLY    by other land formerly of E.F. Chaffee et al, eighty (80) feet.

For Mortgagors' Title see deed of Charles R. Cooke recorded herewith.

BK 3 3 4 6 9 PG 2 7 4

# NON-CONVERSION, NON-DELIVERY & PREPAYMENT PENALTY AGREEMENT - MASSACHUSETTS

WHEREAS, the lender has agreed and committed to provide loan funds to the Borrower through a construction/permanent loan to the Borrower; and

WHEREAS, the lender has relied upon the promises and representations of the Borrower that the Borrower can and will complete the construction of the Borrower's project, and meet all of borrower's obligations regarding the same by the date set forth in the loan documents and described therein as the "Construction Completion Date"; and

WHEREAS, the Borrower has sought to obtain financing from the Lender on the terms and conditions that are beneficial to Borrower, and in so doing has also promised to fulfill all such obligations and to complete all such performances as shall be necessary to permit the conversion of the loan from the Construction Period to the Amortization Period, and the sale and delivery thereof in the secondary mortgage market as described in the Commitment Letter, Addendum To Commitment Letter, Construction Loan Agreement and the loan documents, all as set forth therein; and

WHEREAS, Lender has acted in reliance upon the promises and representations of the Borrower and has made financial commitments which require certain performance by the Lender in regard to the conversion of the loan to the Amortization Period, and the delivery of the loan to the secondary mortgage market, in order to provide such beneficial financing terms to the Borrower, all to the benefit of Borrower; and

WHEREAS, the failure of Borrower, for any reason, to complete all of Borrower's obligations or to meet the requirements necessary for the conversion of the loan to the Amortization Period, and for the delivery of the fully completed loan to the secondary mortgage market, impairs the Lender's ability to meet the financial commitments that it has made in order to provide such financing to Borrower, and requires additional services from Lender in order to cover such financial commitments, and exposes lender to penalties for non-delivery.

NOW THEREFORE, BY SIGNING THIS AGREEMENT THE BORROWER EXPRESSLY AGREES AS FOLLOWS:

**1. SUSPENSION OF PREPAYMENT PRIVILEGE.** The Paragraph of the Note entitled **"BORROWER'S RIGHT TO PREPAY"** shall not be operative and shall not apply to the loan during the Construction Period, or at any time prior to the 1st day of the 4th month after the conversion of the loan to the Amortization Period. Instead, such paragraph 4 shall apply as originally set forth in said Note, only as described below.

**2. NO PREPAYMENT PENALTY AFTER CONVERSION AND DELIVERY:** Beginning on the 1st day of the 4th month after the conversion of the loan to the Amortization Period (and the completion of all of Borrower's obligations in regard to the conversion to amortization), the loan shall contain no prepayment penalty. **Until that time, the loan and the Note shall contain a penalty in the form of an additional service charge which will be imposed in case of non-conversion, non-delivery or early prepayment, as described below.**

**3. FEES DUE ON NON-CONVERSION, NON-DELIVERY OR PREPAYMENT.** A new paragraph 5A shall be added to the Construction Loan Agreement and the Note as follows:

# BK33469PG275

### Additional Service Charge On Failure To Convert, Failure To Deliver or Early Prepayment.

Notwithstanding anything in this agreement to the contrary, it is understood and agreed that the Borrower will pay to the Lender an additional service charge of **2.00% of any full or partial pre-payment**, for services associated with any of the following:

(1) the failure of the loan to fully convert to amortization as described in paragraphs 3, 4 and 5 of the commitment letter and in the loan documents, for any reason; or

(2) the failure of the Borrower to comply with any of the requirements of the Lender necessary to (i) complete disbursement of all of the proceeds under the Note and loan documents or (ii) to permit Lender to successfully deliver the loan for sale in the secondary mortgage market; or

(3) the pre-payment of all or part of the outstanding loan balance before the 1st day of the 4th month after the conversion of the loan to the Amortization Period

This service charge shall be separate from all other payments and charges due under the Note and loan documents, (e.g. extension fees, escrows and the like), and shall be required in addition thereto, if the loan does not convert to the Amortization Period, or if successful delivery is not completed, or if the loan is pre-paid in whole or in part before the 1st day of the 4th month after the conversion of the loan, all as above described. **Conversion of less than the full loan amount shall be treated as a pre-payment** of the amount not converted.

**LENDER FORBEARANCE** - WITHOUT LIMITING THE RIGHTS OF THE LENDER TO IMPOSE THE CHARGES DESCRIBED ABOVE, THE LENDER WILL AGREE TO PERMIT PARTIAL PRE-PAYMENT OF NOT MORE THAN A TOTAL OF 15% OF THE FULL LOAN AMOUNT (CONSIDERING ALL PRE-PAYMENTS MADE) WITHOUT IMPOSITION OF THE CHARGES DESCRIBED THEREIN. IF PREPAYMENTS ARE MADE PRIOR TO THE 1ST DAY OF THE 4TH MONTH AFTER THE CONVERSION OF THE LOAN TO THE AMORTIZATION PERIOD, WHICH TOTAL MORE THAN 15% OF THE FULL LOAN AMOUNT, THE FEES DESCRIBED ABOVE SHALL APPLY ON THE FULL AMOUNT PRE-PAID.

**4. SURVIVAL OF OBLIGATIONS.** The Commitment Letter issued by the Lender and accepted by the Borrower, together with all Addendums, and conditions attached thereto and the Construction Loan Agreement and this Agreement shall survive the closing and shall continue in effect until the 1st day of the 4th month after conversion of the loan to the Amortization Period, unless otherwise extended.

# BK 33469 PG 276

IN WITNESS WHEREOF, the undersigned have hereunto set their hands and seals this 16th ____ day of __August_____, 200_1_.

Witnesses:

_____    _____ (Seal)
                                   **CAROLYN IGOE**                 -Borrower

_____    _____ (Seal)
                                                                   -Borrower

_____ (Seal)   _____ (Seal)
                    -Borrower                                       -Borrower

_____(Space Below This Line For Acknowledgement)_____

**COMMONWEALTH OF MASSACHUSETTS,**            Middlesex    **County    ss:**

On this 16th day of  August,  2001,     , before me personally appeared

**CAROLYN IGOE**      and

known to be the person(s) described in and who exeuted the foregoing instrument, and acknowledged that he/she/they executed the same as his/her/their free act and deed.

My Commission Expires: $2/11/7$

Notary  Public

James J. Burke
NOTARY PUBLIC
My commission expires Feb. 16, 2007

BK 33469 PG 271

# CONSTRUCTION RIDER TO FIXED RATE NOTE AND MORTGAGE

THIS RIDER (agreement) changes the terms of my construction loan note dated **August 16, 2001** and the Mortgage that secures it. By signing this Rider, I agree that the terms in this Rider will apply in place of those in the Note and Mortgage where the two are different.

### 1. CONSTRUCTION

Although the Note and Mortgage do not refer to it, my loan is to be advanced in installments to finance construction. Thus, I agree that my Mortgage shall be amended by adding the following construction language:

Whereas, buildings or improvements on the property at

### 84 Madison Avenue, Everett, Massachusetts 02149

(property) are in process of construction or repair, or are about to be erected or repaired; and whereas, FIRST UNION MORTGAGE CORPORATION has agreed to make the loan herein described to be paid over to me in installments as the work progresses, the time and amount of each advancement to be made in accordance with the progress of the work, after inspection and upon the estimate of FIRST UNION MORTGAGE CORPORATION, so that when all of the work on said premises shall have been completed to the satisfaction of FIRST UNION MORTGAGE CORPORATION, it shall then pay over to me any balance necessary to complete the full loan of $ **260,100.00** ; now therefore, I agree to complete the erection or repair of said buildings to the satisfaction of FIRST UNION MORTGAGE CORPORATION within a reasonable time from the date hereof or at the latest on or before **March 1, 2002** , hereinafter referred to as the **"Construction Completion Date"**.

### 2. FIRST UNION MORTGAGE CORPORATION WILL INSPECT BUT NOT APPROVE THE QUALITY OR COMPLETENESS OF CONSTRUCTION

I agree to give FIRST UNION MORTGAGE CORPORATION 10 days notice before I need money to pay for construction. FIRST UNION MORTGAGE CORPORATION needs this time so it may inspect the work. FIRST UNION MORTGAGE CORPORATION's sole purpose in inspecting the work is to determine the approximate amount and value of the work which has been done. This is so that it can decide how much money to advance to me.

I understand that FIRST UNION MORTGAGE CORPORATION is doing its inspection solely for themselves and not for me. I agree that I will not hold them responsible for their judgment concerning the amount and value of the work that has been done. I also will not hold them responsible concerning the quality or completeness of any construction.

### 3. DELAY IN CONSTRUCTION

I agree that if the construction or repair that is taking place is abandoned, stopped or delayed for such a time or in such a manner that, in FIRST UNION MORTGAGE CORPORATION's opinion, the construction or repair will not be completed by **March 1, 2002** , then:

a. FIRST UNION MORTGAGE CORPORATION may, at its option, stop making advances of money even before **March 1, 2002** ; and

b. it may also make my loan due and payable right away, and make me pay back all the money it has advanced, with interest, expenses and legal fees. In this case, the terms of Paragraph 19 of the Mortgage I signed shall not apply.

### 4. ASSIGNMENT OF LOAN PROCEEDINGS OR ADVANCES PROHIBITED

I agree that I shall not have the right to assign or transfer to anyone my right to get any of the money that is to be advanced by FIRST UNION MORTGAGE CORPORATION as the construction repairs are done. If I do try to assign or transfer my rights, the transfer shall be void and of no effect, unless FIRST UNION MORTGAGE CORPORATION has previously agreed in writing that I may do so.

### 5. DELAY IN BEGINNING TO REPAY LOAN

In spite of the terms of Paragraph 3 of the Note that I signed, I do not have to begin repaying the principal of my loan right away. Instead, I may wait until the 1st day of the second month after **March 1, 2002** , . FIRST UNION MORTGAGE CORPORATION will begin billing me for repayment of the loan amount called

## BK33469PG272

"amortization" on the 1st day of the second month after    **March 1, 2002**    . The only exception is if the Construction Completion Date occurs on the 1st day of a month, in which case I must start repaying principal on the 1st day of the next month. The amount of my monthly payment of prinicipal and interest will be re-computed by FIRST UNION MORTGAGE CORPORATION so as to fully amortize the principal of my loan over the remaining number of months until the maturity date. FIRST UNION MORTGAGE CORPORATION will give me notice of the new amount of my monthly payment of prinicipal and interest and the date on which the payment is due. Unless I am notified otherwise, in writing, the amount of the payment of prinicipal and interest will be **$1,916.37** per month, and I will pay this amount beginning on **April 1, 2002** .

## 6.  IF I DO NOT COMPLETE CONSTRUCTION WHEN I SHOULD

If I have not completed all construction or repairs by    **March 1, 2002**    , then in addition to its other rights under the loan documents, FIRST UNION MORTGAGE CORPORATION has the right to:

1. declare a default and exercise all of its rights reserved in the loan documents to act in case of default; or

2. agree to allow more time for construction to be completed and to disburse any remaining loan funds into a CONSTRUCTION DELAY RESERVE ACCOUNT which shall then begin to accrue interest at the Note Rate, as though the funds had been fully advanced for construction; and

3. charge me a CONSTRUCTION DELAY SURCHARGE, as detailed in the commitment letter for this loan.

4. charge me for all costs associated with the preparation and recording of all extension agreements, escrow materials and title insurance endorsements, and all other costs incurred in order to extend the time for completion of construction.

## 6A.  ADDRESS FOR NOTICE TO LENDER.

The Borrower agrees to notify the Lender immediately upon receipt of any Notices of Claims, Mechanics Lien Notices or Notice Of Contract or in the event that a stop notice or cease and desist order is issued by any government agency or department. Such notice shall be given by certified mail return receipt requested to:

> **EVELYN ANDRESS, VICE PRESIDENT**
> **CONSTRUCTION LENDING DEPARTMENT**
> **FIRST UNION MORTGAGE CORPORATION**
> **214 N. HOGAN STREET, 8TH FLOOR**
> **JACKSONVILLE, FL 32202**

Any person wishing to claim the benefit of any Notices of Claims, Mechanics Lien Notices or Notice Of Contract is advised by the recording hereof that the address of the Lender for receipt of such notice is shown above. Any such notice should be delivered to such address by certified mail return receipt requested.

## 7.  HOW WILL I PAY INTEREST DURING CONSTRUCTION

During construction I will pay FIRST UNION MORTGAGE CORPORATION interest, not in advance, on the principal amount that it has advanced at any time. I will pay this interest within 15 days of the time when FIRST UNION MORTGAGE CORPORATION bills me for it. This will be billed to me on the 1st day of each month during the construction period of this loan up until the amortization period begins, and it will be my responsibility to pay the amount of interest billed to me within 15 days.

## 8.  UNDERSTANDING

I agree that before signing I've read this agreement and received a completed copy. I understand it and agree to all its terms.

## 9.  EXTINGUISHMENT OF CERTAIN PROVISIONS.

Unless otherwise extended in writing, on    **March 1, 2002**    , the provisions of this rider, except paragraph 5, shall self-extinguish and be of no further force and effect, provided however, that any causes of action, claims or rights of the Lender which accrue before said date shall continue unaffected and undiminished by such extinguishment.

## 10.  CONSTRUCTION LOAN ADVANCES.

This Rider is to be attached to and forms a part of that certain Mortgage given by the undersigned as Mortgagor(s) to FIRST UNION MORTGAGE CORPORATION, of even date herewith. The Attachment of this rider to the Mortgage is intended to and shall cause said Mortgage to be a "Construction Mortgage". For the

# BK33469PG273

purposes of this Rider, the Construction Mortgage Loan Program commitment letter issued by the Lender and accepted by the undersigned Borrowers in regard to this loan shall be deemed to have survived the closing of this loan, and all Advances made to Borrowers shall be made by the Lender in accordance with the terms thereof and the loan documents.

Date:_____

Borrower:   **CAROLYN ZGOE**

_____

Borrower:

The undersigned represented the Borrower(s) when he/she/they signed this Rider.

_____     _____
Attorney                                                    Date

GOLDEN ONE ™   Construction Rider To Fixed Rate Note and Mortgage - MASSACHUSETTS  -  CR -3  (970414)
Page 3                               © First Union Mortgage Corporation                    Loan #      7289805

BK35703PG275

$1^3$

Please Return To:
Construction Lending Dep't
Wachovia Mortgage Corporation
214 N. Hogan, 8th Floor
Jacksonville, FL 32202

Antro Borrett Burke + Kennedy
one Essex Green Dr
Peabody, MA 01960

_____(Space Above this Line for Recording Data)_____

## LOAN MODIFICATION AGREEMENT
### TO EXTEND CONSTRUCTION PERIOD

This Loan Modification Agreement is made as of        **March 1, 2002**      by the undersigned

### CAROLYN IGOE

hereinafter referred to as "Borrower", whether one or more, in regard to that certain Mortgage Deed, Deed of Trust or Security Instrument (hereinafter "Security Instrument") made by the Borrower in favor of **FIRST UNION MORTGAGE CORPORATION** now by corporate merger **WACHOVIA MORTGAGE CORPORATION**, with a principal place of business at 1100 Corporate Center Drive, Raleigh, North Carolina 27607-5066, ("Lender") which is dated        **August 16, 2001**      and which secures the debt of the Borrower, as set forth in a Fixed Rate Promissory Note of even date therewith (hereinafter "Note"), in the original principal amount of **$      260,100.00**      against the property of the Borrower located at

### 84 Madison Avenue, Everett, Massachusetts 02149

and which provides for the construction of improvements upon the said property, as more fully described in said Security Instrument, and which Security Instrument is recorded at

**Volume**      33469      **Page**      255

of the      Middlesex South District Registry of Deeds

Records.

        **WHEREAS**, the Borrower wishes to extend the time for the Borrower to complete the erection or repair of buildings or improvements that is set forth in the loan documents, including particularly the Construction Rider To Fixed Rate Note and Mortgage, that was originally executed by the Borrower and attached as a Rider to the Note, and that was recorded with such Security Instrument (both copies of which are hereinafter referred to as "Construction Rider"; and

        **WHEREAS**, the Borrower wishes to extend the period for construction without the establishment of a Construction Delay Reserve Account at this time, but prefers instead to modify the executed and recorded documents to exend the Construction Completion Date, without limiting or altering the right of the Lender to establish the Construction Delay Reserve Account at a future time, if the Lender shall deem it necessary;

        **NOW THEREFORE**, in consideration of One ($1.00) Dollar and other valuable consideration and of the terms hereof, the parties hereto do hereby modify and amend the aforesaid Construction Rider only as follows:

MASSACHUSETTS - Single Family - **GOLDEN ONE**  **Loan Modification To Extend Construction Period**
Page 1                                              7289805                                              970130

(left margin, vertical text)
WED 06/19/02 02:02:36    854    38.00

BK35703PG276

1. The terms of the loan documents and said Construction Rider are hereby altered and amended to change the date described as the "Construction Completion Date" from **March 1, 2002** (wherever it appears as originally provided therein) to **June 1, 2002**.

2. In accordance with the terms of paragraph 5 of the Construction Rider, as amended hereby, the Borrower shall continue to make monthly payments of interest only, at the interest rate required under the terms of the Note, in an amount based upon the outstanding principal balance all as therein provided until **July 1, 2002**. On **August 1, 2002**, the Borrower shall commence the payment of principal and interest, in the amount of **$1,921.82**.

3. Nothing contained herein shall limit or amend any of the the the rights of the Lender in any way, including without limitation, the right to establish a Construction Delay Reserve Account at a future time, if the Lender shall deem it necessary.

4. Except as modified hereby, the aforesaid Note, Security Instrument and Construction Rider remain unchanged and in full force and effect, and the modifications and amendments made herein shall not serve to extend or alter the final maturity date described therein.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Modification Agreement and in any rider(s) executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                   CAROLYN IGOE                     Borrower

_____          _____ (Seal)
                                                                   Borrower

_____          _____ (Seal)
            Borrower                                               Borrower

_____(Space Below This Line For Acknowledgement)_____

**COMMONWEALTH  OF  MASSACHUSETTS,**          Middlesex  **County**  ss:

On this  8th  day of  March  , 200 2 , before me personally appeared

**CAROLYN  IGOE**

known to be the person(s) described in and who executed the foregoing instrument, and acknowledged that he/she/they executed the same as his/her/their free act and deed.

My Commission Expires:  2|16|9          _____
                                                  Notary Public

James J. Burke
NOTARY PUBLIC
My commission expires Feb. 16, 2007

MASSACHUSETTS - Single Family - GOLDEN ONE  Loan Modification To Extend Construction Period
Page 2                                        7289805                                        970130

BK35703PG277

IN WITNESS WHEREOF, Lender has executed this Agreement under seal as of this date: March 4, 2002

Signed, sealed and delivered in the presence of:

WACHOVIA MORTGAGE CORPORATION
formerly known as
FIRST UNION MORTGAGE CORPORATION

BY: _____ (SEAL)
CECELIA SOWELL
As Its Duly Authorized Vice President

Witness

Witness

STATE OF FLORIDA, COUNTY OF DUVAL     ss. Jacksonville

On the ___4th___ day of ___March_____, 2002, before me, the undersigned, a Notary Public in and for said State, personally appeared

CECELIA SOWELL, Vice President

of Wachovia Mortgage Corporation, a North Carolina corporation, on behalf of the corporation. She is personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and she acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, she acted on behalf of the corporation, and executed the instrument as its duly authorized Vice President.

My Commission Expires

(This area for Official Notarial Seal)

_____ (SEAL)
Notary Public

Charlotte C Lane
My Commission CC912032
Expires November 29, 2002

BK35703PG278

Please Return To:
Construction Lending Dep't
Wachovia Mortgage Corporation
214 N. Hogan, 8th Floor
Jacksonville, FL 32202

*Antico Barrett Burke + Kawitsky*
*One Essex Green DR*
*Peabody MA 01960*

_____(Space Above this Line for Recording Data)_____

## LOAN MODIFICATION AGREEMENT
## TO EXTEND CONSTRUCTION PERIOD

This Loan Modification Agreement is made as of    **March 1, 2002**    by the undersigned

### CAROLYN IGOE

hereinafter referred to as "Borrower", whether one or more, in regard to that certain Mortgage Deed, Deed of Trust or Security Instrument (hereinafter "Security Instrument") made by the Borrower in favor of **FIRST UNION MORTGAGE CORPORATION** now by corporate merger **WACHOVIA MORTGAGE CORPORATION**, with a principal place of business at 1100 Corporate Center Drive, Raleigh, North Carolina 27607-5066, ("Lender") which is dated    **August 16, 2001**    and which secures the debt of the Borrower, as set forth in a Fixed Rate Promissory Note of even date therewith (hereinafter "Note"), in the original principal amount of $    **260,100.00**    against the property of the Borrower located at

### 84 Madison Avenue, Everett, Massachusetts 02149

and which provides for the construction of improvements upon the said property, as more fully described in said Security Instrument, and which Security Instrument is recorded at

**Volume**    33469    **Page** 255

of the   Middlesex South District Registry of Deeds

Records.

**WHEREAS,** the Borrower wishes to extend the time for the Borrower to complete the erection or repair of buildings or improvements that is set forth in the loan documents, including particularly the Construction Rider To Fixed Rate Note and Mortgage, that was originally executed by the Borrower and attached as a Rider to the Note, and that was recorded with such Security Instrument (both copies of which are hereinafter referred to as "Construction Rider"; and

**WHEREAS,** the Borrower wishes to extend the period for construction without the establishment of a Construction Delay Reserve Account at this time, but prefers instead to modify the executed and recorded documents to exend the Construction Completion Date, without limiting or altering the right of the Lender to establish the Construction Delay Reserve Account at a future time, if the Lender shall deem it necessary;

**NOW THEREFORE,** in consideration of One ($1.00) Dollar and other valuable consideration and of the terms hereof, the parties hereto do hereby modify and amend the aforesaid Construction Rider only as follows:

BK 35703 PG 279

1. The terms of the loan documents and said Construction Rider are hereby altered and amended to change the date described as the "Construction Completion Date" from         March 1, 2002 (wherever it appears as originally provided therein) to  July 31, 2002.

2. In accordance with the terms of paragraph 5 of the Construction Rider, as amended hereby, the Borrower shall continue to make monthly payments of interest only, at the interest rate required under the terms of the Note, in an amount based upon the outstanding principal balance all as therein provided until August 1, 2002. On September 1, 2002, the Borrower shall commence the payment of principal and interest, in the amount of  $1,923.20 .

3. Nothing contained herein shall limit or amend any of the the rights of the Lender in any way, including without limitation, the right to establish a Construction Delay Reserve Account at a future time, if the Lender shall deem it necessary.

4. Except as modified hereby, the aforesaid Note, Security Instrument and Construction Rider remain unchanged and in full force and effect, and the modifications and amendments made herein shall not serve to extend or alter the final maturity date described therein.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Modification Agreement and in any rider(s) executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                          CAROLYN IGOE                      Borrower

_____          _____ (Seal)
                                                                           Borrower

_____          _____ (Seal)
                      Borrower                                             Borrower

_____(Space Below This Line For Acknowledgement)_____

COMMONWEALTH OF MASSACHUSETTS,            Middlesex      County    ss:

On this  13th  day of     June       , 200 2 , before me personally appeared

CAROLYN  IGOE

known to be the person(s) described in and who exeuted the foregoing instrument, and acknowledged that he/she/they executed the same as his/her/their free act and deed.

My Commission Expires: 4/16/09       _____
                                           Notary Public

James J. Burke
NOTARY PUBLIC
My commission expires Feb. 16, 2007

# BK35703PG280

IN WITNESS WHEREOF, Lender has executed this Agreement under seal as of this date:   June 7, 2002

Signed, sealed and delivered in the presence of:

### WACHOVIA MORTGAGE CORPORATION

_____
Witness

BY: _____ (SEAL)
CECELIA SOWELL
As Its Duly Authorized Vice President

_____
Witness


**STATE OF FLORIDA, COUNTY OF DUVAL**      ss. Jacksonville


On the __7th__ day of ___June_____, 200_2, before me, the undersigned, a Notary Public in and for said State, personally appeared


### CECELIA SOWELL, Vice President


of Wachovia Mortgage Corporation, a North Carolina corporation, on behalf of the corporation. She is personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and she acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, she acted on behalf of the corporation, and executed the instrument as its duly authorized Vice President.

My Commission Expires

(This area for Official Notarial Seal)

_____ (SEAL)
Notary Public

# JOHN H. MOLLOY
ATTORNEY AT LAW

385 Broadway, Suite 402
Revere, Massachusetts 02151
Telephone: (781) 284-9934
Facsimile: (781) 284-5301

3353 Washington Street
Jamaica Plain, Massachusetts 02130
Telephone: (617) 522-9701
Facsimile: (617) 522-9703

* Please direct all correspondence to Revere office

## M.G.L. c. 93A §2(A) DEMAND LETTER
## CERTIFIED MAIL 7002 3150 0003 7957 4593
## RETURN RECEIPT REQUESTED

Wachovia Mortgage Corporation
214 N. Hogan Street, 8th Floor
Jacksonville, Fl. 32202
ATTN; TERRY CANNON

October 28, 2003

**Re:    Carolyn Igoe**
**88-90 Madison Avenue, Everett, MA**
**LOAN NO.;728905-00**

Dear Sir/Madam::

Kindly be advised that this firm and your undersigned have been retained by
Carolyn Igoe with regard to a construction loan your company granted to her in connection with
the premises known as 88-90 Madison Avenue, Everett Massachusetts.

Please consider this letter a formal demand for relief pursuant to M.G.L. c. 93A, §2(A).
Claim is hereby made against Wachovia Mortgage Corporation for unfair, unlawful and
deceptive practices engaged in by you during the inspection of 88-90 Madison Avenue, Everett
Massachusetts by your agents and consequential disbursement of loan funds to Champion
Homes, a Massachusetts construction concern..

Please be further advised and notified that M.G.L. c. 93A provides for multiple damages,
attorney's fees and costs of litigation. This correspondence is sent as an effort to solicit and
encourage settlement of this matter before litigation is commenced in the Trial Court of the
Commonwealth of Massachusetts, or if jurisdiction permits, in the Federal District Court.
Pursuant to M.G.L. c. 93A, §91, you have a thirty (30) day period from the date of delivery or
mailing of this written demand for relief to make a written tender of settlement. Should you fail
to make a meaningful response and reasonable offer of settlement within thirty (30) days from
the date of this correspondence, I will begin litigation at once.

Notwithstanding, this letter is to be construed as an assertion of a legal right to recover
from you any and all damages sustained as a result of this claim.

Any communications by and between the parties and their counsel arising out of or in response to this letter shall be engaged in without prejudice and with all rights existing under the transactions and events referred to herein, unless otherwise agreed to in writing.

It is our contention Wachovia Mortgage Corporation for purposes of loan proceeds disbursal failed to adequately inspect the premises located at 88-90 Madison Avenue Everett, Massachusetts and said failure caused the premature release of funds to Champion Homes Inc. which said Champion Homes then fraudulently and intentionally converted the disbursed monies for it's own use and failed to perform under its contract to complete the construction of 88-90 Madison Avenue, Everett Massachusetts Specifically Wachovia Mortgage Corporation in or about June 2001 inspected the premises in question and deemed same to be 90% complete and shortly thereafter released to Champion Homes Inc. $105, 819.00. The disbursement in question occurred before the second portion of the structure was delivered to the site and in fact was located in Chelsea, Massachusetts awaiting delivery. The disbursement was executed prior to the installation of flooring, appliances, electrical, plumbing, and heating systems. This disbursement was made in direct contravention of those terms and conditions set out in Wachovia Mortgage Corporation's so-called "Three Part modular Funding Schedule".

It is our further contention that your malfeasance caused Ms. Igoe to incur unnecessary interest fees and extension costs associated with the delays in construction. Your conduct and failure to perform substantially all that was contracted for caused Ms. Igoe to mitigate her damages. Ms. Igoe, after Champion absconded with approximately $106, 000.00 disbursed by Wachovia Mortgage Corporation was forced to secure the services of an alternate contractor. Said contractor was required to correct innumerable deficiencies in Champion's work and complete the structure. The cost of mitigating those damages caused by Wachovia Mortgage Corporation's premature disbursal amounts to $130,000.00. Due to Wachovia Mortgage Corporation's premature disbursal of construction loan funds and the resultant delays associated with Champion's disappearance with those funds Ms. Igoe was caused to incur unnecessary interest and extension fees in the amount of $43,345.41.

Ms. Igoe, due to your breach, was caused to lose the benefit of the bargain offer in of which was presold in the structure. The potential buyer was unable to defer purchase for as long as your delay caused. Ms. Igoe was then unable to secure the benefit of the cash flow said sale would have provided.

Upon information and belief, the above-cited conduct was performed willfully and knowingly. As a result of the unfair and deceptive acts and practices undertaken by Wachovia Mortgage Corporation, Ms. Igoe suffered past and ongoing financial injury and demands that Wachovia Mortgage Corporation reimburses her for these losses in the amount of $300,000.00.

Sincerely,

John H. Molloy

JHM/

cc: Carolyn Igoe



**spatitle**
Sent by: Angel Berry

05/02/2005 12:11 PM

To    Audrey Ridgeway/HOMEQ/WACH@WACHOVIA

cc    Kobi Brinson/Legal/WACH@WACHOVIA, Pam
      McCuller/Legal/WACH@WACHOVIA

Subject    Litigation Stop - -0005183715/Knowles

Greetings Audrey,

The above referenced asset is in litigation so I am not certain why it was referred out for foreclosure. The No Notice "L" has been on the account for some time as I was investigating a payment dispute. Corporate Legal is now handling a separate matter so there are multiple reasons why we should not proceed. Please cease all action until so directed.

Thank you,

*Angel Taylor Berry*
Title Resolution Manager/Litigation Management Supervisor
Special Assets Department
Default Management Services
HomEq Servicing Corporation
1100 Corporate Center Drive, NC 4742
Raleigh, NC 27607
Phone: (919) 852-8530
Fax: (919) 852-7350
E-Mail: angel.berry@wachovia.com



"Madison,Carlton S ."
<Carlton.Madison@cna .com>

05/12/2005 04:21 PM

To  "Ryan D. Bolick" <rbolick@cshlaw.com>

cc  <gary.kravitz@wachovia.com>,
    <pam.mcculler@wachovia.com>, "Billstone,Gregory S."
    <Gregory.Billstone@cna.com>

Subject  RE: Morrison Lawsuits Pending in Western District of NC


Thanks for the response. I understand the pltf may not be willing to
settle the claim if there were the possibility of additional civil
prosecution against the pltf. (This is our insured's decision and at
this time I am not sure of their intent regarding potential future
recovery of the outstanding debt).

From our special investigation unit (SIU) perspective - I have been
informed that we as an insurance company are required under NC law to
inform the appropriate authorities of any Insurance compliance issues we
recognize. That is what I was referring to regarding retaining CNA's
rights to future litigation. Actually these rights would really be the
State of NC since our information would be turned over to the state of
NC. I just want to be very careful with the settlement agreement so once
this is completed there is not an avenue for the pltf to bring some
other cause of action against our insured and/or CNA. Bear in mind I am
not in our SIU department and may be overly cautious on this issue.


Thanks,
Carlton


-----Original Message-----
From: Ryan D. Bolick [mailto:rbolick@cshlaw.com]

Sent: Thursday, May 12, 2005 2:13 PM
To: Madison,Carlton S.
Cc: gary.kravitz@wachovia.com; pam.mcculler@wachovia.com;
Billstone,Gregory S.
Subject: RE: Morrison Lawsuits Pending in Western District of NC


Mr. Madison

The information contained in your e-mail is correct.  I understand
Wachovia's position as well as that of CNA's Special Investigation Unit
re the retention of a right to pursue the debt and or additional
potential recovery.  However, as I relayed to Pam McCuller via e-mail
earlier today, practically speaking Mr. Morrison will likely not agree
to any settlement or payment unless there is some assurance that there
will be no more litigation.  Additionally, as the amount is not large
and Wachovia had already "charged off" the amount, I would likely advise
Wachovia (and CNA's Special Investigation Unit) to waive their rights to
additional litigation if we were able to obtain injunctive relief and
dismissal of Morrison's claim with prejudice.  As I have explained to
Pam, Mr. Morrison has been indicted in Mecklenburg County for filing a
false police report alleging identity theft.  Defense counsel has also
discussed sharing all the information we have obtained throughout our
respective investigations with the county and federal authorities in
hopes of aiding them in a more thorough criminal prosecution of Mr.

Morrison. Certainly any civil settlement we reach with Mr. Morrison would not restrict our right and or duty to share information which may lead to his criminal prosecution.

Hopefully I have given you the information you require. I will be in a deposition this afternoon but will be available tomorrow morning to discuss any questions you may have. Thank you.

-----Original Message-----
From: Madison,Carlton S. [mailto:Carlton.Madison@cna.com]

Sent: Thursday, May 12, 2005 1:59 PM
To: Ryan D. Bolick
Cc: gary.kravitz@wachovia.com; pam.mcculler@wachovia.com;
Billstone,Gregory S.
Subject: RE: Morrison Lawsuits Pending in Western District of NC

Mr. Bolick,

Thank you for the update and the discussion this morning regarding this claim.

Per our discussion, I understand that Mr. Morrison stated he did not want to attempt a global settlement with all 4four entities, he would rather settle with each one individually. The plaintiff has already OFFERED $2,000 each to Toyota Motor Credit and MBNA to settle the counter claims filed against him and to dismiss his suits against those entities. Both Toyota Motor Credit, and MBNA denied the plaintiff's settlement offer.

As we also discussed, each of the defendants indicated if the pltf does change his mind and wants to attempt a global settlement the pltf's total settlement offer proceeds likely should be split between each defendant on a pro-rata basis of the amount they are owed. I personally agree with this approach - if the pltf is willing to extend a global settlement offer.

I also understand the settlement proposal includes each defendant retains their right to seek recovery of their outstanding debt - is this correct? If this is not the case clearly our insured would have to agree to waive the plaintiff's outstanding balance.

Also, since our telephone discussion I have discuss this with our Special Investigation Unit. They would like for us to retain our rights to pursue other "legal action" against the pltf. Therefore if the pltf's demands the settlement include protection from future legal action we will need to discuss that aspect of the settlement. (I have also clarified with our special investigation unit they will not become involved until we have obtained a settlement with the pltf so as they would not have a negative impact on the settlement process).

Mr. Kravitz,

As you can see this is the very rare case where the plaintiff may
actually PAY us and dismiss his suit against us. I know the previous
question from Ms. McCuller was would the amount (if any) paid by the
pltf be utilized to pay down the outstanding debt, or basically be
directed back to CNA. I have discussed this with my unit manager and
defense counsel. IF the pltf agrees to either settle our potential
counter claim against him directly with defense counsel, or if it is
part of some global settlement offer the proceeds from that settlement
would actually be payable to Southtrust - not CNA. Obviously the choice
would be yours if you wish to utilize the proceeds to pay down the
outstanding debt, apply towards your policy deductible, etc.

I would be happy to discuss this claim with you if you like. Clearly
this is not your "average" claim resolution.

Thanks,
Carlton


-----Original Message-----
From: Ryan D. Bolick [mailto:rbolick@cshlaw.com]

Sent: Thursday, May 12, 2005 10:46 AM
To: Madison,Carlton S.
Cc: gary.kravitz@wachovia.com
Subject: FW: Morrison Lawsuits Pending in Western District of NC


Mr. Madison

Please see the email we discussed re a proposed settlement with Mr.
Morrison.  Please call once you have had a chance to review.  Thanks

-----Original Message-----
From: Oettinger, Ken [mailto:KOettinger@wcsr.com]

Sent: Thursday, May 12, 2005 11:19 AM
To: Jackson Moore; Ryan D. Bolick; chriswhitepa@nc.rr.com
Cc: Hanley, Stephanie
Subject: Morrison Lawsuits Pending in Western District of NC


Please see Confidentiality Notice before reading email.
****************************************************************

Gentlemen:

This e-mail follows up on our conference call and summarizes the
settlement approach that we have agreed to discuss with our respective
clients:

1.  Dismissal with prejudice of all of Morrison's claims;

2.  Acknowledgement of validity of each debt that Morrison has
challenged;

3.  Consent to entry of Order enjoining him from filing actions under
state or federal consumer protection statutes without first obtaining

leave of court (the Court probably will decline to enjoin state court
filings and may only be willing to enjoin filing in the Western
District) (I think we try to get as broad an injunction as possible but
note for our clients that the injunction may well be limited to
Morrison's "home" federal district);

4.   Lump sum payment as partial payment of each creditor's attorneys'
fees or perhaps if Morrison insists - to compromise the debt - with the
sum paid by Morrison allocated among the four (4) creditors on a
percentage basis or in some other manner agreed to in advance by the
creditors);

5.   Dismissal of the creditors' remaining counterclaims WITHOUT
prejudice (so each creditor can continue reporting the debt on his
credit report unless a creditor agrees not to continue reporting) (we
still may want a dismissal with respect to our claims).

As we had discussed before, I believe that we should urge our clients
not to focus on the total recovery too much as the dollars are
relatively modest and an early settlement will save attorneys' fees and
other litigation costs.

We also noted during the call that Toyota Motor Credit has already
turned down a settlement offer of approx. 50% and that we would
recommend that our clients strive for an allocation agreement that would
allow Toyota to recover more than it has already turned down (obviously
subject in part on what Morrison is willing/able to pay)

Based on our call, it appears that the creditors are owed as follows:

| 1. | U.S. Bank. | Approx. | $12,500 |
| 2. | MBNA | | Approx. |
| $11,000 | | | |
| 3. | Toyota Motor Credit | Approx. | $ 5,500 |
| | | | |
| 4. | SouthTrust/Wachovia | Approx.. | $ 3,400 |

I will initiate a follow up call with Chris and Ryan at 1:30 PM tomorrow
and will look forward to talking with Jackson later in the afternoon as
his schedule permits. (Jackson, I will try you sometime during the 4:00
hour).

I look forward to working with each of you to bring this litigation to
an expeditious conclusion.

Kenneth B. Oettinger, Jr.
Womble Carlyle Sandridge & Rice, PLLC
Charlotte, NC
Phone: 704.331.4976
Fax: 704.338.7826

*****************************************************************
CONFIDENTIALITY NOTICE: This electronic mail transmission has been

sent by a lawyer. It may contain information that is confidential,

privileged, proprietary, or otherwise legally exempt from

disclosure. If you are not the intended recipient, you are hereby

notified that you are not authorized to read, print, retain, copy

or disseminate this message, any part of it, or any attachments.

If you have received this message in error, please delete this

message and any attachments from your system without reading the

content and notify the sender immediately of the inadvertent

transmission. There is no intent on the part of the sender to waive

any privilege, including the attorney-client privilege, that may

attach to this communication. Thank you for your cooperation.

Confidentiality Notice:  If you are not the intended recipient of this
message, you are not authorized to intercept, read, print, retain, copy,
forward, or disseminate this communication. This communication may
contain information that is proprietary, attorney/client privileged,
attorney work product, confidential or otherwise legally exempt from
disclosure. If you have received this message in error, please notify
the sender immediately either by phone (800-849-4444) or by return
e-mail and destroy all copies of this message (electronic, paper, or
otherwise).


E-MAIL CONFIDENTIALITY NOTICE:  The contents of this e-mail message and
any attachments are intended solely for the

addressee(s) and may contain confidential and/or legally privileged
information. If you are not the

intended recipient of this message or if this message has been addressed
to you in error, please

immediately alert the sender by reply e-mail and then delete this
message and any attachments. If you

are not the intended recipient, you are notified that any use,
dissemination, distribution, copying, or

storage of this message or any attachment is strictly prohibited.

E-MAIL CONFIDENTIALITY NOTICE:  The contents of this e-mail message and any
attachments are intended solely for the

addressee(s) and may contain confidential and/or legally privileged
information. If you are not the

intended recipient of this message or if this message has been addressed to
you in error, please

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                          SUPERIOR COURT DEPARTMENT
                                     OF THE TRIAL COURT
                                     CIVIL ACTION NO.:  SUCV2005-00970-H

```
                                          )
CAROLYN PIMENTAL formerly known as        )
CAROLYN IGOE,                             )
                                          )
    Plaintiff,                            )
                                          )
-v-                                       )
                                          )
WACHOVIA MORTGAGE                         )
CORPORATION formerly known as             )
FIRST UNION MORTGAGE CORPORATION,         )
                                          )
    Defendant.                            )
                                          )
```

RECEIVED

MAY 19

LEGAL DIVISION

## FIRST AMENDED COMPLAINT AND JURY CLAIM

### *Parties*

1.      Plaintiff Carolyn Pimental *f/k/a* Carolyn Igoe (hereinafter "Mrs. Pimental")
is a resident of Revere, Suffolk County, Massachusetts.

2.      Defendant Wachovia Mortgage Corporation (hereinafter "Wachovia
Mortgage") is a financial institution having a principal place of business in Jacksonville,
Florida. At all times material hereto, First Union Mortgage Corporation is a predecessor
corporation of Wachovia Mortgage Corporation.

### *Jurisdiction*

3.      Jurisdiction is conveyed in this matter pursuant to M.G.L. c. 223A, § 3, *et.*
*seq.*

### *Statement of Facts*

4.      On or about May 23, 2001, Mrs. Pimental entered into a contract entitled
*Sales Agreement and Deposit Receipt* (hereinafter "*Sales Agreement*") with Champion
Homes USA which, upon information and belief, is owned and operated by one Raymond
J. Peveri. A copy of the *Sales Agreement* is attached hereto as *Exhibit 1* and incorporated
herein by reference. The purpose of the *Sales Agreement* was to facilitate the construction

of a pre-fabricated or modular home on property located at 88-90 Madison Avenue, Everett, Middlesex County, Massachusetts (*also known as* 84 Madison Avenue) (hereinafter referred to as "the Property.")

5.     On or about August 16, 2001, Mrs. Pimental purchased the Property for the sum of $115,170.00. A copy of the *Quitclaim Deed* is attached hereto as *Exhibit 2*.

6.     On or about August 16, 2001, Mrs. Pimental entered into a *Mortgage Deed* in the amount of $261,100.00 with First Union Mortgage Corporation, which, upon information and belief, is the predecessor corporation of Wachovia Mortgage Corporation. A copy of the *Mortgage Deed* is attached hereto as *Exhibit 3*.

7.     On or about August 16, 2001, Mrs. Pimental entered into a *Construction Rider to Fixed Rate Note and Mortgage*. A copy of the *Construction Rider* is attached hereto as *Exhibit 4*.

8.     Pursuant to the *Sales Agreement (Exhibit 1)*, the following amounts were paid to Champion Homes by Mrs. Pimental through the loan proceeds and by way of private funds:

| April 2, 2001 | Deposit | $ 5,000.00 |
|---|---|---|
| August 22, 2001 | Deposit | 20,700.00 |
| June 6, 2002 | Foundation | 15,400.00 |
| June 6, 2002 | Kitchen Cabinet Upgrading | 5,400.00 |
| June 21, 2002 | Complete Construction | 109,277.00 |
| | Total | $155,777.00 |

9.     On March 4, 2002, Mrs. Pimental entered into a *Loan Modification Agreement to Extend Construction Period* to June 1, 2002. A copy of the *Loan Modification Agreement* is attached hereto as *Exhibit 5*.

10.     On June 7, 2002, Mrs. Pimental entered into a *Loan Modification Agreement to Extend Construction Period* to July 31, 2002. A copy of the *Loan Modification Agreement* is attached hereto as *Exhibit 6*.

11.     Mr. Peveri constructed the foundation and garages contracted for. However, these were built with substandard materials, in an unworkmanlike manner and below-industry standards for craftsmanship.

12.     On or about June 15, 2002, defendant Wachovia Mortgage, its agents, servants or employees, inspected the Property site.

13.     On or about June 25, 2002, Mr. Peveri left the work site at the Property and failed to complete the work contracted and paid for by Mrs. Pimental.

-2-

14.     As a result of its inspection on June 15, 2002, defendant Wachovia Mortgage erroneously determined that the construction process was 90% complete and shortly thereafter released to Mr. Peveri and Champion Homes, Inc. funds in the amount of $105,819.00.

15.     The foregoing disbursement of $105,819.00 was made prior to fully one-half of the pre-fabricated structure being delivered to and assembled at the work site.

16.     At the time of the inspection and disbursal aforesaid, the so-called "second half" of the home was located in Chelsea, Suffolk County, Massachusetts awaiting delivery.

17.     The foregoing disbursement was made prior to installation of flooring, appliances, electrical, plumbing and heating systems in the first portion of the structure.

18.     The foregoing disbursement was made in direct contravention of the terms and conditions set out in Wachovia Mortgage's so-called "Three Part Modular Funding Schedule."

19.     By failing fully and properly to inspect the construction site located at the Property, Wachovia Mortgage caused $105,819.00 in funds prematurely and erroneously to be distributed to Mr. Peveri and Champion Homes, Inc.

20.     The foregoing premature and erroneous distribution of funds was paid to a contractor who had yet to complete 25% of the project.

21.     Wachovia Mortgage's inspection and determination that 90% of the project was complete when in fact fully one-half of the structure of the home was not on site, proximately caused Mrs. Pimental to incur significant financial damages.

22.     Mrs. Pimental was forced to secure the services of an alternate contractor to finish construction of the dwelling and correct innumerable deficiencies in the work of Champion Homes, Inc. and Mr. Peveri.

23.     Mrs. Pimental was caused to incur expenses in mitigation of these damages caused by the actions and inactions of defendant Wachovia Mortgage in the approximate amount of $130,000.00.

24.     Due to defendant Wachovia Mortgage's premature and erroneous disbursal of construction loan funds and the resultant delays caused thereby, Mrs. Pimental was caused to incur unnecessary interest and extension fees in the amount of $43,345.41.

25.     Due to defendant Wachovia Mortgage's premature and erroneous disbursal of construction funds, Mrs. Pimental was caused to lose the benefit of an offer tendered prior to completion of the project. The potential buyer was unable to defer purchase

-3-

during construction delays.

## COUNT I
### *Breach of Contract*

26.    Mrs. Pimental restates and reasserts ¶¶ 1-25 of the *First Amended Complaint* as if fully stated herein.

27.    Due to the actions and inactions of Wachovia Mortgage aforesaid, Wachovia Mortgage breached the terms of the contract by and between Mrs. Pimental and Wachovia Mortgage dated August 16, 2001 and modifications thereto.

28.    Plaintiff has been damaged thereby.

WHEREFORE, plaintiff Carolyn Pimental demands judgment against defendant Wachovia Mortgage Corporation *formerly known as* First Union Mortgage Corporation; that damages be established and that plaintiff be awarded same, along with costs, interest and reasonable attorney's fees; and for such other and further relief as this Court deems just and proper.

## COUNT II
### *Negligence*

29.    Mrs. Pimental restates and reasserts ¶¶ 1-25 of the *First Amended Complaint* as if fully stated herein.

30.    As a consequence of the negligence of defendant Wachovia Mortgage Corporation, its agents, servants or employees in failing properly and completely to inspect the construction site aforesaid, the funds were improperly and negligently caused to be disbursed to Mr. Peveri and Champion Homes, Inc.

31.    Plaintiff has been damaged thereby.

WHEREFORE, plaintiff Carolyn Pimental demands judgment against defendant Wachovia Mortgage Corporation *formerly known as* First Union Mortgage Corporation; that damages be established and that plaintiff be awarded same, along with costs, interest and reasonable attorney's fees; and for such other and further relief as this Court deems just and proper.

## COUNT III
### *Violation of M.G.L. c. 93A*

32.    Mrs. Pimental restates and reasserts ¶¶ 1-31 of the *First Amended Complaint* as if fully stated herein.

33.    Defendant's premature and erroneous disbursal of construction loan funds was done willfully and knowingly and constituted unfair, unlawful and deceptive practices in violation of Massachusetts General Laws. c. 93A.

34.    Plaintiff caused a demand letter in compliance with M.G.L. c. 93A, § 2(A) to be forwarded to defendant on October 28, 2003. Said demand letter outlined and set forth the facts and circumstances as they appear in this *First Amended Complaint*. A copy of the 93A letter is attached hereto as *Exhibit 7* and is incorporated herein by reference.

35.    Defendant failed timely to respond to plaintiff's demand for relief sent pursuant to M.G.L. c. 93A, § 2A.

36.    By its conduct, actions and inactions, defendant has engaged in unfair and deceptive acts and practices in violation of M.G.L. c. 93A, §§ 2(A). As a consequence, plaintiff has been caused great expense.

37.    Plaintiff has been damaged thereby.

WHEREFORE, plaintiff Carolyn Pimental demands that it be established that defendant has engaged in unfair and deceptive acts or practices in violation of M.G.L. c. 93A, § 2(A) and regulations promulgated thereunder and further that defendant is liable to plaintiff as follows for:

(a)    actual damages in an amount this Court deems just and proper plus interest;

(b)    pursuant to M.G.L. c. 93A, § 9, double or treble the amount of actual damages due to defendant's bad faith and willful violation of M.G.L. c. 93A, § 2;

(c)    attorney's fees and costs; and

(d)    such other and further relief as this Court deems just and proper.

## *Jury Claim*

Plaintiff requests a trial by jury on all issues of material fact.

CAROLYN PIMENTAL *f/k/a*
CAROLYN IGOE, Plaintiff,
By her Attorney,


John H. Molloy        BBO #600778
385 Broadway - Suite 402
Revere, Massachusetts 02151
(781) 284-9934
(781) 284-5301-FAX

# EXHIBITS

| 01. | May 23, 2001 | Champion Homes USA Sales Agreement & Deposit Receipt | |
| 02. | August 16, 2001 | *Quitclaim Deed* 84 Madison Avenue Everett, MA 02149 | From Charles R. Cooke to Carolyn Igoe |
| 03. | August 16, 2001 | Mortgage Deed - First Union Mortgage Corporation | |
| 04. | August 16, 2001 | Construction Rider to Fixed Rate Note and Mortgage - First Union Mortgage Corporation | |
| 05. | March 4, 2002 | Loan Modification Agreement to Extend Construction Period | Extending Construction Completion Date from March 1, 2002 to June 1, 2002 |
| 06. | June 7, 2002 | Loan Modification Agreement to Extend Construction Period | Extending Construction Completion Date from March 1, 2002 to July 31, 2002 |
| 07. | October 28, 2003 | M.G.L. c. 93A Demand Letter to Wachovia Mortgage Corporation | |

%JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Carolyn Pimental, formerly known as
Carolyn Igoe

**DEFENDANTS**

Wachovia Mortgage Corporation, formerly
known as First Union Mortgage Corporation

**(b)** County of Residence of First Listed Plaintiff  Suffolk, MA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant Duval ___, FL
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
John H. Molloy, 385 Broadway, Suite 402,
Revere, MA 02151 -- (781) 284-9934

Attorneys (If Known) Nicholas J. Rosenberg and Donald
E. Frechette, Edwards & Angell, LLP
101 Federal St., Boston, MA 02110 617-439-4444

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 | U.S. Government Plaintiff |
| ☐ 2 | U.S. Government Defendant |
| ☐ 3 | Federal Question (U.S. Government Not a Party) |
| ☒ 4 | Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES(Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                          and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒☒☒ | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒☒☒ |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☒ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN   (Place an "X" in One Box Only)

| | | | | | Appeal to District |
|---|---|---|---|---|---|
| ☐ 1 Original Proceeding | ☒ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):

## VI. CAUSE OF ACTION

Brief description of cause:
Breach of contract, negligence, M.G.L.c. 93A

## VII. REQUESTED IN
COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☐ Yes   ☐ No

## VIII. RELATED CASE(S)
IF ANY

(See instructions):

JUDGE

DOCKET NUMBER

DATE
5/15/05

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #        AMOUNT        APPLYING IFP        JUDGE        MAG. JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY) Carolyn Pimental, formerly known as
Carolyn Igoe v. Wachovia Mortgage Corporation, formerly known as First Union
Mortgage Company

2. CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL
   COVER SHEET. (SEE LOCAL RULE 40.1(A)(1)).

___  I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

___  II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,      *Also complete AO 120 or AO 121
           740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.        for patent, trademark or copyright cases

_XX_ III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
           315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
           380, 385, 450, 891.

___  IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
           690, 810, 861-865, 870, 871, 875, 900.

___  V.    150, 152, 153.

3. TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(G)). IF MORE THAN ONE PRIOR RELATED CASE
   HAS BEEN FILED IN THIS DISTRICT PLEASE INDICATE THE TITLE AND NUMBER OF THE FIRST FILED CASE IN THIS COURT.

4. HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS
   COURT?
                                                                      YES        NO

5. DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE
   PUBLIC INTEREST?   (SEE 28 USC §2403)
                                                                      YES        NO
   IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?
                                                                      YES        NO

6. IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE
   28 USC §2284?
                                                                      YES        NO

7. DO ALL OF THE PARTIES IN THIS ACTION, EXCLUDING GOVERNMENTAL AGENCIES OF THE UNITED STATES AND THE
   COMMONWEALTH OF MASSACHUSETTS ("GOVERNMENTAL AGENCIES"), RESIDING IN MASSACHUSETTS RESIDE IN THE
   SAME DIVISION? - (SEE LOCAL RULE 40.1(D)).
                                                                      YES        NO

   A.    IF YES, IN WHICH DIVISION DO ALL OF THE NON-GOVERNMENTAL PARTIES RESIDE?

         EASTERN DIVISION             CENTRAL DIVISION               WESTERN DIVISION

   B.    IF NO, IN WHICH DIVISION DO THE MAJORITY OF THE PLAINTIFFS OR THE ONLY PARTIES, EXCLUDING
         GOVERNMENTAL AGENCIES, RESIDING IN MASSACHUSETTS RESIDE?

         EASTERN DIVISION             CENTRAL DIVISION               WESTERN DIVISION

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME  Nicholas J. Rosenberg
ADDRESS Edwards & Angell, LLP, 101 Federal St., Boston, MA  02110
TELEPHONE NO.  617-951-3314

(Cover sheet local.wpd - 11/27/00)