UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CAROLYN PIMENTAL *formerly known as* CAROLYN IGOE, <br>           Plaintiff, <br><br> v. <br><br><br> WACHOVIA MORTGAGE CORPORATION *formerly known as* FIRST UNION MORTGAGE CORPORATION <br>           Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )    CIVIL ACTION NO.: <br>      1:05-cv-11097 (WGY) |

## <u>MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS</u>

### I.    <u>INTRODUCTION</u>

This case arises out of a construction mortgage provided by plaintiff, as borrower, to Wachovia Mortgage Corporation ("Wachovia"), as lender. As is typical with construction mortgages, the loan documents provided for site inspections and partial loan disbursements until the proceeds of the loan were fully advanced. Plaintiff claims Wachovia breached its contract with her, and was negligent, because, following such inspections, it allowed loan proceeds to be advanced that were disproportionate to the amount of construction that had actually been completed. She similarly contends the advances were improper because the construction work at issue – which was not performed by Wachovia – was shoddy. Plaintiff thus claims Wachovia's alleged breaches and malfeasance also amount to a violation of *Mass. Gen. Laws*, ch. 93A.

Wachovia respectfully contends the *Amended Complaint* fails to state a claim upon which relief can be granted. In particular, and as appears on the face of the *Amended Complaint* itself, Wachovia's conduct was specifically sanctioned by the relevant lending contract, and cannot, therefore, be considered a breach thereof. In addition, plaintiff's contract with Wachovia

explicitly acknowledged the non-viability of the claims she now seeks to assert against Wachovia. Further, Wachovia's conduct cannot, as a matter of law, be deemed negligent because Wachovia owed no duty to plaintiff with respect to the inspection or disbursement process – a fact again repeatedly acknowledged by plaintiff. Finally, because plaintiff's Chapter 93A claim is predicated upon Wachovia's alleged breaches of contract and negligence – which claims are deficient for the reasons aforesaid – the Chapter 93A claim must also be dismissed.

## II.    PLAINTIFF'S ALLEGATIONS[1]

On or about May 23, 2001, plaintiff, Carolyn Pimental f/k/a Carolyn Igoe ("Pimental"), entered into a contract with Raymond Peveri d/b/a Champion Homes USA (individually referred to as "Peveri," and in his business capacity as "Champion") for the construction of a pre-fabricated home on property located in Everett, Massachusetts (the "Property). (*First Amended Complaint And Jury Claim* (the "*Amended Complaint*"), ¶4). The Property was not owned by Pimental when she entered into her contract with Champion. (*Id.*, ¶ 5). Wachovia was not a party to the contract between Pimental and Champion (*id.*, Exhibit 1), and Champion is not a party to these proceedings.

On or about July 30, 2001, Wachovia (through its predecessor in interest, First Union Mortgage Corporation) issued a commitment letter to Pimental (the "*Commitment*"), a copy of which is attached herto as Exhibit A.[2] The commitment letter allows Wachovia to conduct site inspections. (*Commitment*, p. 3). Importantly, though, it also provides that such inspections are:

---

[1] For the limited purposes of Wachovia's *Motion to Dismiss*, Wachovia acknowledges its obligation to accept all of plaintiff's factual averments as true. *See Iwata v. Intel Corp.*, 349 F.Supp.2d 135, 140 (D. Mass. 2004).

[2] The *Commitment* is properly considered in connection with this motion. First, its authenticity is not seriously open to challenge. Second, it is referenced in the *Complaint*. (*See Amended Complaint*, Exhibit 4, *Construction Rider to Fixed Rate Note and Mortgage* (the "*Rider*"), p. 3). Third, it is central to Pimental's claims. *See, e.g., Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001); *In re Polaroid Corp. Sec. Litig.*, 134 F.Supp.2d 176, 182-83 (D. Mass. 2001).

- 2 -

"solely for [Wachovia's] own purposes and not for [Pimental's] benefit. *[Pimental] agrees that [she] will not hold [Wachovia] responsible for its judgment concerning the amount and value of the work that has been completed. [Pimental] agrees that [she] will not hold [Wachovia] responsible concerning the quality or completeness of any construction.*"

(*Commitment*, ¶ 18, p. 3) (emphasis added).

On or about August 16, 2001, Pimental executed a certain *Mortgage Deed* and *Construction Rider to Fixed Rate Note and Mortgage* (the "*Rider*"). (*Amended Complaint*, ¶¶ 6, 7; *see also id.*, Exhibits 3 and 4). Pursuant to the *Rider*, Wachovia was permitted to disburse the loan's proceeds as construction advanced and, further, to monitor that construction by periodically inspecting the Property. (*Id.*, Exhibit 4, ¶¶ 1, 2). Importantly, though, the *Rider* again contained an important limitation on Wachovia's liability:

I understand that [Wachovia] is doing its inspection solely for themselves and not for me. *I agree that I will not hold them responsible for their judgment concerning the amount and value of the work that has been done. I also will not hold them responsible concerning the quality or completeness of any construction.*

(*Id.*, Exhibit 4, ¶ 2) (emphasis added).

In addition, and on that same date, Pimental also executed a certain *Construction Loan Agreement* (the "*CLA*"), a copy of which is attached hereto as Exhibit B.[3] The *CLA* granted Wachovia plenary authority in connection with the construction loan, *including the right to alter the construction schedule and to make disbursements at Wachovia's discretion.* (*See CLA*, ¶ 2, p. 2). And, for yet a *third* time, the *CLA* also contained an important acknowledgement/waiver by plaintiff:

It is understood between the parties hereto that the Borrower has selected all architects, contractors, subcontractors, materialmen, as well as all others furnishing services or materials to the

---

[3] The *CLA* is also properly considered in connection with this motion. *See* footnote 2, *supra*.

> construction project and the *Lender has, and shall have, no responsibility whatsoever for them or for the quality of their materials or workmanship, it being understood that the only consideration passing from the Lender to the Borrower is the loan proceeds in accordance with and subject to the terms of this agreement and the Commitment Letter signed by the Borrower. It is also agreed that the Borrower shall have no right to rely on any procedures required by the Lender herein, such procedures being for the protection of the Lender and no one else.*

(*CLA*, ¶ 11, p. 5) (emphasis added).

Alleging that Champion failed to fully perform its construction responsibilities by leaving the job before it was completed, and, to the extent work was done, that the same was unworkmanlike, Pimental tried in April, 2004 to recover damages from Peveri, but he had filed bankruptcy. (*See Request For Determination Of Dischargeability Of Debt*, April 23, 2004 (the "*Request*"), United States Bankruptcy Court, Division of Massachusetts, Case No.: 04-10782-WC11, ¶¶ 11, 12, attached hereto as <u>Exhibit C</u>).[4]

Recognizing that recovery against Peveri was unlikely, and undeterred by the contracts she signed with Wachovia, Pimental then commenced this action almost a year later, in March, 2005, by the filing of a complaint. (*See Plaintiff's Complaint And Jury Demand*, March 11, 2005 (the "*Complaint*")). Two months later, before the *Complaint* had been served,[5] Pimental filed her *Amended Complaint*. In essence, the *Amended Complaint* asserts the same claims Pimental has made against Peveri – namely, that he failed to fully and properly perform his construction contract – but the *Amended Complaint* now asserts that these failures are Wachovia's fault. Specifically, Pimental asserts that:

---

[4] Putting aside familiar doctrines of judicial notice, the *Request*, as a public record, is again also properly considered in connection with this motion. *See* footnote 2, *supra*, generally; *Alternative Energy*, 267 F.3d at 33.

[5] Wachovia was never served with the *Complaint*, and was unaware of the filing of same until it was served with the *Amended Complaint*

- Wachovia's inspection failed to reveal that Champion's construction was unworkmanlike and substandard and, as a result, Pimental was forced to hire a new contractor to correct the alleged deficiencies (*Amended Complaint*, ¶¶ 11, 12, 22);

- Wachovia's inspection grossly overestimated the progress of the work that had been done pursuant to the Pimental – Champion contract; finding that such work was 90% complete when, in actuality, Champion had yet to finish 25% of the work called for by its contract. As a result of Wachovia's faulty inspection, a disbursement of $105,819.00 was wrongfully made to Champion, and Pimental has, in numerous ways, been thereby damaged (*id.*, ¶¶ 12, 14-17, 19-21, 23-25);

- Wachovia's conduct amounted to a breach of contract (*id.*, Count I), negligence (*id.*, COUNT II), and a violation of *Mass. Gen. Laws*, ch. 93A (*id.*, COUNT III).

Wachovia now seeks to dismiss the *Amended Complaint* in its entirety.

### III.  **ARGUMENT**

Pimental's claims must be dismissed.  As the contracts she ***thrice*** signed plainly indicate, Wachovia's inspection was done for its own benefit – not for Pimental's – and she specifically acknowledged she would not hold Wachovia responsible for either the quality or completeness of any construction activities.  (*See Rider* (attached as <u>Exhibit 4</u> to the *Complaint*), ¶ 2; *see also Commitment,* ¶ 18, p. 3; *CLA,* ¶ 2, p. 2).  Moreover, Pimental expressly acknowledged that Wachovia had discretion, if it so chose, to alter any payment schedule with respect to the loan proceeds.  (*See CLA,* ¶ 2, p. 2).

This precise issue was addressed in *Clark v. Rowe*, 428 Mass. 339 (1998).  In *Clark*, plaintiff sued her banker in connection with his failure to properly monitor and approve the distribution of certain construction loan advances.  Following a directed verdict by the trial court, the Supreme Judicial Court affirmed, finding the banker owed no duty of care to plaintiff.  *Id.* at

- 5 -

346. "Any duty of the lender under the loan agreement to monitor the account was for its benefit and was waivable by it." *Id.*

In reaching this conclusion, *Clark* relied on *In re Fordham*, 130 B.R. 632 (Bankr. D. Mass. 1991). *In re Fordham* dealt with a construction lender's disbursement of loan proceeds in violation of a loan provision that required the borrower to demonstrate that forty of the condominium units that were the subject of the loan had been "pre-sold." *Id.* at 638. In addition, the loan documents also required the submission of an appraisal, as well as final plans and specifications, again as a condition of the loan. *Id.* at 639-40. Like the loan contract here, the loan documents in *In re Fordham* provided that all conditions with respect to the obligation to make advances were "imposed solely and exclusively for the benefit of Lender." *Id.* at 640.

In determining that the bank had not breached its contract by making advances in contravention of the express provisions of the loan agreement, *In re Fordham* observed:

> There are obvious difficulties with this argument. First[, the bank] made no "promises", even to [borrower], when it imposed these conditions to its obligation of disbursement. They were only that-- conditions precedent to [the bank]'s obligation to [borrower] to make any advance for construction costs. They were in existence for its benefit and no one else's. This is made abundantly clear by Article 4.12 of the construction loan agreement which permits [the bank] to "make advances prior to or without fulfillment by Borrower of all of the conditions precedent thereto." It is again emphasized by Article 6.3 of the construction loan agreement stating that "[a]ll conditions of the obligations of Lender to make advances hereunder are imposed solely and exclusively for the benefit of Lender and may be freely waived or modified in whole or in part by Lender at any time." ***Even in the absence of provisions expressly authorizing a waiver of conditions to a lender's obligations, the lender is entitled to waive the conditions because they are for its benefit.***

*Id.* at 642 (citations omitted, emphasis added). Similarly, in disposing of plaintiff's negligence claims, the Court stated:

> Borrowers have also been unsuccessful in charging lenders with negligent supervision of disbursements under a loan agreement. In *Thormahlen v. Citizens Savings and Loan,* 73 Or.App. 230, 698 P.2d 512 (1985), the court held that a construction lender had no duty to use reasonable care to see that periodic loan disbursements did not exceed the specified percentages of construction costs.

*Id.* at 647-48.

*Blais v. Warren Five Cents Savings Bank,* 1993 Mass. App. Div. 213, 1993 WL 488429 (Mass. App. Div., Dist. Ct. Nov. 22, 1993), is also particularly instructive. In *Blais,* the loan agreement provided for disbursements "when the construction reached stages of completion corresponding to a designated schedule and 'upon inspection and approval in each instance by the Lender.'" 1993 WL 488429, at *1. The loan contract also provided that: "[T]he Borrower shall have no right to rely on any procedures required by the Lender herein, such procedures being for the protection of the Lender and no one else." *Id.* Plaintiff alleged that the contractor had been paid "approximately twice the amount of work that was actually done, and the disbursements were thus grossly disproportionate to the work as specified in the disbursement schedule." *Id.* In affirming the trial court's grant of summary judgment, the Court stated:

> Nor can it be said that the facts could justify a finding that the defendant-lender assumed a duty of care. The loan agreement failed to create any relationship which would impose a duty upon the lender independent of its contractual obligation. RESTATEMENT (SECOND) OF TORTS, § § 331, 552, 552A-B (1977); *Banker's Trust Co. v. Steenburn,* 409 N.Y.S.2d 51 (1978). [FN1]
>
> FN1. See *Thornhale v. Citizen Savings and Loan,* 73 Or.App. 230 (1985), wherein the defendant-lender was found to owe no duty to exercise reasonable care to limit the disbursement of loan proceeds on a construction loan.

*Clark, In re* Fordham, and *Blais* all counsel in favor of dismissal. Like the lenders in each of those cases, Wachovia had every right to make an inspection of the Property before it made a disbursement; but that right was for its benefit, ***not*** plaintiff's. And, as if this recognition

of the common law weren't enough – and it is – Wachovia went one step further.  Specifically, and on *three separate occasions*, it obtained Pimental's explicit contractual affirmation that the construction inspection was *solely* for Wachovia's benefit (*see Commitment,* ¶ 18, p. 3; *Rider,* ¶ 2; *CLA,* ¶ 11, p. 5), as well as her promise that she would not hold Wachovia responsible for: (1) "[its] judgment concerning the amount and value of the work that has been done"; or (2) "the quality or completeness of any construction."    (*See Rider* (attached as <u>Exhibit 4</u> to the *Complaint*), ¶ 2; *see also Commitment,* ¶ 18, p. 3).

The *Rider, CLA* and *Commitment all* contain Pimental's contractual acknowledgement that Wachovia's site inspections, undertaken as a prelude to disbursements, could not serve as a basis for liability arising out of the quality of the inspected construction or its progress.  But that is precisely what the *Complaint* seeks to do, as best demonstrated by Pimental's efforts to assert the exact same liability against Wachovia as she has previously asserted against her bankrupt builder. (*See Request, passim*).[6]

It is thus clear that, in addition to attempting to create contractual and tort duties where none exist, plaintiff also seeks to enforce liabilities she has specifically recognized as moribund. Indeed, all of her litigation efforts as against Wachovia are in direct disregard of multiple express contractual undertakings by Pimental.

---

[6] Pimental also asserts Wachovia's disbursements were "made in direct contravention of the terms and conditions set out in Wachovia['s] . . . so-called 'Three part Modular Funding Schedule.'"  (*Complaint,* ¶ 18).  Interestingly, though, Pimental fails to attach a copy of that document to the *Complaint*.

It is respectfully submitted that the schedule, attached hereto as <u>Exhibit D</u>, does not establish any contractual obligation on the part of Wachovia to adhere to any particular schedule.  More importantly, though, the schedule most certainly does not abrogate the broad disclaimers of responsibility/liability included in the *Rider, CLA* or *Commitment*.

## IV.    CONCLUSION

For all of the foregoing reasons, the *Complaint* should be dismissed.

**THE DEFENDANT**
**WACOVIA MORTGAGE**
**CORPORATION**

June 7, 2005

By_____
Donald E. Frechette
B.B.O. #547293

Nicholas J. Rosenberg
B.B.O #657887

EDWARDS & ANGELL, LLP
101 Federal Street
Boston, MA  02110-1800
(617) 439-4444  Telephone
(617) 439-4170  Telecopy

## REQUEST FOR ORAL ARGUMENT

Pursuant to *Local Rule* 7.1, Wachovia requests an oral argument on its Motion.

_____
Nicholas J. Rosenberg

## CERTIFICATION PURSUANT TO *LOCAL RULE* 7.1

Pursuant to *Local Rule* 7.1 of the *Local Rules of the United States District Court for the District of Massachusetts*, I, Nicholas J. Rosenberg, certify that on June 3, 2005, Donald E. Frechette of Edwards & Angell, LLP spoke with opposing counsel and informed him of the substance of the within motion, and the likelihood that this motion would be filed.  The parties respectfully disagreed with respect to the merits of this motion and were thus unable to further resolve or narrow the issues herein presented.

_____
Nicholas J. Rosenberg

HFD_150633_1/DFRECHETTE

## CERTIFICATION

This is to certify that on this 7th day of June, 2005, a copy of the foregoing was mailed, first class, postage prepaid, to:

John H. Malloy, Esq.
385 Broadway, Suite 402
Revere, MA 02151
(781) 284-9934 (phone)
(781) 284-5301 (fax)

Nicholas J. Rosenberg

HFD_150633_1/DFRECHETTE

Jul-31-01  04:07pm   From-WHOLESALE CONSTRUCTION              +8664380280         T-275  P.02/13  F-392

# FIRST UNION MORTGAGE CORPORATION

## GOLDEN ONE ™ FIXED RATE MORTGAGE
### CONSTRUCTION/PERMANENT MORTGAGE LOAN PROGRAM

**Date:**     **July 30, 2001**

LOAN OVERVIEW

**Name of Borrower:**             Carolyn Igoe
**Address of Borrower:**          3 Porter Avenue, Revere, MA 02151
**Loan Amount:**                  $260,100.00
**Mortgage Property Address:**    84 Madison Avenue, Everett, MA 02149
**Loan Account Number:**          7289805
**Loan Term:**                    30 years
**Rate Lock in Effect**           ____Yes        __X__No   Date Expires:
**FUMC Product Number:**          1118
**Conforming**                    X..
**Jumbo**

Dear Borrowers:

FIRST UNION MORTGAGE CORPORATION ("FUMC" or "Lender") hereby advises you ("Borrower") that based on the information, statements, and representations furnished by you, FUMC has approved your Construction/Permanent Mortgage request subject to the terms and conditions stated herein. The above loan overview is only an outline of some of the terms and conditions of this loan. The details of the loan are as follows:

**1. BORROWER:**           Carolyn Igoe

**2. AMOUNT OF LOAN:**     $260,100.00

**3. Term of the Loan:**     The term of the loan shall include a period of time for the completion of construction called the "CONSTRUCTION PERIOD", followed by a period of time for full amortization (repayment of the loan) called the "AMORTIZATION PERIOD". The actual length of the Construction period will be established under a separate RATE LOCK AGREEMENT. The RATE LOCK AGREEMENT will set forth a date certain by which the construction of your residence must be completed. This date is called the CONSTRUCTION COMPLETION DATE. The total of the Construction Period and the Amortization Period shall equal the total loan term which shall be **30 years ( 360 months ).**

**4. RATE OF INTEREST DURING CONSTRUCTION & RATE LOCK:**

____ **If this box is checked,** the interest rate is established at **XXX%** for this loan provided that the loan actually closes on or before **XXX.** After this rate, the interest rate is subject to change.

__XX__ **If this box is checked,** the interest rate for this loan is NOT YET ESTABLISHED, and will only be established upon your completion of a RATE LOCK AGREEMENT, in accordance with separate RATE LOCK INSTRUCTIONS and the policies of FUMC regarding rate locks. This loan commitment is conditioned upon your locking an interest rate not higher than **8.00%,** which is the maximum interest rate at which this loan can be underwritten and closed. If interest rates increase to a level higher than **8.00%,**

this commitment is voidable at the option of FUMC. THE RISK OF INTEREST RATE INCREASES IS ON THE BORROWER.

**5.  Conversion Date**  On the first day of the first month after your CONSTRUCTION COMPLETION DATE, the loan will convert to a fully amortizing fixed rate mortgage payable over the remaining loan term, with interest on the outstanding balance computed as described above.  This conversion to amortization must occur on the 1st day of a month and is called the "CONVERSION DATE". You will be billed for "interest only" due on the outstanding principal balance right up to the CONVERSION DATE.

**5A.  Repayment of Loan Principal:**  Your first monthly payment of principal and interest together shall actually be due, however, on the first day of the <u>second</u> month after your CONSTRUCTION COMPLETION DATE. (The only exception to this is if your CONSTRUCTION COMPLETION DATE occurs on the 1st day of a month, then the CONVERSION DATE falls on that same day and your first monthly payment will be due on the first day of the first month thereafter, rather than the first day of the second month thereafter).  In any event FUMC will bill you and provide notice of the computation of your monthly payment of Principal and Interest.

**6.  MORTGAGE SECURITY:**  The loan will be secured by a first mortgage lien as evidenced by a Mortgage (herein referred to as the "mortgage") on the real property and improvements to be constructed on the property located at:

**84 Madison Avenue, Everett, MA 02149**

**7.  TERM OF COMMITMENT:**  This Commitment will expire on **August 14, 2001** unless the enclosed copy hereof, bearing your written acceptance, is received by FUMC on or before **August 14, 2001.**

**8.  CONSTRUCTION FEE:**  This commitment is conditioned on your acceptance and fulfillment of the terms and conditions set out herein and your payment of the sum of **$2,601.00**, representing **1.00%** percent of the loan amount, at the time of the Closing as a Construction Fee .

**9.  LOAN ORIGINATION FEE:**  The sum of $TBD , representing **TBD%** percent of the loan amount, shall be paid by you to FUMC at the time of the Closing as a Loan Origination Fee.

**9A.  LOAN DISCOUNT FEE:**  The sum of $ TBD representing **TBD %** percent of the loan amount, shall be paid by you to FUMC at the time of the Closing as a Loan Discount Fee.

**10.  PAYMENT, GRACE PERIOD & LATE CHARGES:**  During the Construction period you will pay interest only due on the 1st day of each month in accordance with billing which FUMC will send you, and you will have a 15 day "grace period". During the Amortization period, you will pay principal and interest in accordance with the terms of the Loan documentation, and you will have a "grace period" of 15 days. A late charge of **3.00%** will automatically be added to any payment not actually received when due.

**11.  NO PREPAYMENT PENALTY:**  The loan shall contain no prepayment penalty

**12.  ESCROWS:**  You may be required to provide escrows for payment of taxes, insurance, flood insurance and private mortgage insurance.

**13.  FLOOD INSURANCE:**  You may be required to provide flood insurance if the property is determined to be in a flood hazard insurance zone for which flood insurance is required and available.

**14.  PLACE OF CLOSING:**  The closing of the loan shall take place as soon as mutually convenient to the parties at the offices of FUMC's attorney or representative named below.

**To Be Determined**

First Union Mortgage Corporation
GOLDEN ONE ™  Construction / Permanent Loan Commitment Letter - Massachusetts

Please contact the above-named attorney or representative to arrange for the closing, once you have provided all of the information required for the underwriting of the loan. See the special conditions attached below.

**15.  CLOSING DATE:** After you accept this commitment, you must actually close the loan on or before **September 1, 2001.** If you do not close the loan on or before this date, this commitment will lapse and thereafter FUMC will no longer be obligated to make the loan. In such a case, all non-refundable fees will be kept by FUMC.

**16.  Scheduled Completion Date & Delayed Completion:**   All improvements shall be substantially completed by the Conversion Date, to the satisfaction of FUMC. If the work has not been completed by the end of the Construction Period, FUMC may, at its sole option:
>  1.  declare a default and exercise all of its rights reserved in the loan documents to act in case of default; or
>  2.  agree to allow more time for construction to be completed and to disburse any remaining loan funds into a CONSTRUCTION DELAY RESERVE ACCOUNT which shall then begin to accrue interest at the Note Rate, as though the funds had been fully advanced for construction.
>  3.  In the event that FUMC shall utilize such Construction Delay Reserve Account you will be required to begin repaying principal and interest under the loan documents as though construction had been completed on time. The Construction Delay Reserve Account shall hold the
>  4.  If FUMC determines that it does not wish to permit more time for construction, it shall have no obligation to do so. If it determines that it prefers instead to extend the time for construction through Modification of the loan documents the Borrower agrees to pay the costs, fees and expenses associated with such extension.

**16A.  Construction Delay Surcharge:**  Delays in the completion of construction subject FUMC, to additional costs beyond those anticipated in the pricing of the loan to the Borrower. Thus, in addition to the other charges and costs described in this commitment, in the event that FUMC shall implement a Construction Delay Reserve Account, it shall charge the Borrower a monthly surcharge for the costs of such delay, which shall be calculated at one-half of one percent (0.500%) per month on the entire loan amount, including the amount in the Construction Delay Reserve Account. This surcharge shall be deemed to be a cost of the lender secured by the security instrument, and shall be charged to the Borrower for each calendar month, or any part thereof, that the Construction Delay Reserve Account shall contain funds. FUMC shall directly withdraw the Construction Delay Surcharge from the funds on hand in the Construction Delay Reserve Account on the first day of each month. It shall also bill the Borrower for such sums as shall be necessary to replenish the Construction Delay Reserve Account with such funds as it shall deem necessary in order to assure completion of the construction of the premises.

**17.  DISBURSEMENTS:** Advances will be made from time to time as construction progresses for work "in place only", as determined by FUMC based upon inspection of the progress of the work. The cost of the inspections will be paid by the Borrower.  Requests for disbursements must be accompanied by a statement by the Borrower that the Borrower believes the work in place has progressed to a point where disbursement as scheduled is proper, a list of mechanics, trades and suppliers that have performed the work to date and a statement signed by Borrower and Builder that the construction project is "on budget and on time". The Borrower must expend the sum required to be contributed by Borrower toward the completion of the project before FUMC will advance any funds under the Construction Advance Schedule. The Lender may require such title insurance endorsements as it shall deem necessary prior to any advances for improvements built on the site.

**18.  INSPECTION:**   Borrower agrees to give FUMC at least 10 days notice prior to Borrower's desired disbursement date. Borrower expressly acknowledges that FUMC will inspect but not approve the quality or completeness of the construction, and that FUMC will complete its inspection solely for its own

purposes and not for Borrower's benefit. Borrower agrees that Borrower will not hold FUMC responsible for its judgment concerning the amount and value of the work that has been completed. Borrower agrees that Borrower will not hold FUMC responsible concerning the quality or completeness of any construction.

**19. TITLE INSURANCE:** A signed title insurance binder (to be supplemented after closing by a signed policy of title insurance) from a title company approved by FUMC dated the date of recording of the mortgage, with premium paid, insuring FUMC in the total amount of the loan as a holder of a valid first mortgage lien on the Borrower's fee simple interest in the property, free and clear of all liens (including mechanics' liens), rights of parties in possession, encumbrances and title exceptions other than those approved by FUMC.

Borrower may be required to provide "continuation searches" or further title bring downs satisfactory to FUMC or its title representative at Borrowers expense in connection with each funding disbursement during the construction phase and/or upon modification or extension of the loan or its conversion to permanent financing status.

**20. HAZARD INSURANCE POLICY - CONSTRUCTION COVERAGE:** During the first phase of this loan, the "construction period", you will have to provide hazard insurance that is broad enough to insure against the perils and risks of loss or damage associated with the construction process. The coverage must be broad enough to insure materials that are "on site" even if not yet "in place". Your attorney or representative will advise you regarding the coverages that will be required and whether you or your builder will supply the insurance.

The amount of coverage must be at least equal to the amount of the loan and the policy must insure the full "replacement cost" of the improvements. There can be no provision for "co-insurance" or other provision which could reduce the amount of coverage.

Your builder (or in some cases you as the land owner) will also need to provide "builders risk" liability coverage. Your attorney or representative will assist you with this.

At closing you or your builder will be required to produce the original insurance policy or policies for the above insurances, (binders will not be acceptable), and a receipt showing payment in full for one full year from the closing date.

The insurance company selected by you to provide the insurance for the transaction must have at least a General Policyholders rating of "B" and a Financial Size Category of III in Best's Key Rating Guide, or Demotech Incorporated Rating Guide.

Once construction is completed the insurance coverage for "construction perils" can be canceled, provided that your ordinary hazard insurance coverages continue without gap or lapse in coverage.

**21. RECERTIFICATION OF VALUE:** You agree that the value of your property will be recertified prior to the conversion of the loan to its permanent phase. If at the time of recertification, your loan-to-value ratio (the loan amount divided into the amount of verified acquisition costs or the recertified property value, whichever is less) exceeds 80%, private mortgage insurance will be required as a condition of making the mortgage loan. You will be responsible for the payment of the entire cost of mortgage insurance, if needed upon recertification or otherwise. This payment is estimated to be $2,028.78 for the first year's premium, with a monthly escrow of $169.06

If private mortgage insurance is required, FUMC will require that the insurance remain in effect and that you continue to pay private mortgage insurance premiums until the loan has been paid in full, except as otherwise required by law.

**22. DESIGNATION OF LOSS PAYEE:** FUMC must be identified as the loss payee on the title insurance commitment and final title insurance policy and on the homeowner's insurance policy. The address of FUMC for notification under such policies shall be as follows:

**FOR HOMEOWNER'S INSURANCE:**
FIRST UNION MORTGAGE CORPORATION, its successors and/or assigns, as their interests may appear, P.O. Box 57664, Jacksonville, FL 32241-7664

Jul-31-01  04:08pm    From-WHOLESALE CONSTRUCTION                    +8664388289           T-275   P.06/13   F-392

**FOR TITLE INSURANCE:**
FIRST UNION MORTGAGE CORPORATION. its successors and/or assigns, as their interests may appear

**23. ESCROWS:** At the option of FUMC, you will have to pay into an escrow account with us monthly amounts required for payment of real estate taxes, hazard insurance premiums and Private Mortgage Insurance and flood insurance, if applicable

**24. SURVEY INSURANCE OR SURVEY:**    1.  At closing you must provide either title insurance endorsements insuring matters of survey, in a fashion satisfactory to FUMC; or a survey sufficient to protect the interests of the Mortgagee, in accordance with the closing customs prevailing in your area, satisfactory to FUMC, as it shall determine. If a survey is required it must show the perimeter of the parcel, its access to the public highways, and any easements or encroachments onto the parcel. It must also show any important site constraints that might impact on your construction such as any streams, rivers, riverbeds, wetlands, conservation areas, open space areas or other areas or circumstances that might restrict your construction. Because the standards for surveys vary in different regions, your attorney or title insurance representative will assist you with the survey requirement. The survey must also address such matters as are required by the title insurance company, and must be satisfactory to it.
    2.  At the time of the loan advance for foundation or improvements, the Title Insurance Company must provide an acceptable Title Insurance "run down" and foundation survey endorsement, and/or you may be required to provide an actual footing survey certified to FIRST UNION MORTGAGE CORPORATION, as it shall determine.
    3.  Prior to the final loan advance, an updated final "as built" completion survey satisfactory to FUMC may be required, if under the circumstances, one is required by the title insurance company, any governmental agency or if such a survey is customarily provided to construction lenders in your area, as determined by FUMC.

**25. TAXES:** All unpaid taxes, assessments and/or unmatured assessments shall be paid in full prior to the disbursement of any of our loan proceeds and copies of receipted bills furnished to us.

**26. EXPENSES:** Your acceptance of this commitment shall constitute your agreement to pay all fees, costs, charges, and expenses with respect to this loan or its making, or in any way connected thereto, including, without limiting the generality thereof, the fees and expenses of our closing attorney for examination of title, survey, tenant leases, etc., costs, architect's/engineer's inspection report, stamps as required, mortgage taxes, and any other taxes, fees and expenses payable in connection with this transaction. FUMC will not be required to pay any premium, brokerage fee or commission or similar compensation in connection with this transaction, and by your acceptance of this commitment, you agree to defend, indemnify and hold us harmless against and from any and all claims for any fees, charges, taxes, and compensation in connection with our loan and its making.

**27. SECONDARY FINANCING:** There will be no secondary financing without FUMC's prior written approval in FUMC's sole and absolute discretion and if such consent be given, FUMC's first mortgage shall provide that a default under the second mortgage shall constitute a default under FUMC's mortgage.

**28. NON-ASSIGNABILITY OF COMMITMENT:** The identity of the Borrower is of material importance to FUMC. This commitment may not be assigned by the Borrower, nor may there be any sale or transfer of ownership of any interest of the Borrower without FUMC's prior express written approval. FUMC shall have no obligations whatever hereunder to any third party without the consent of FUMC.

**29. FIRST UNION MORTGAGE CORPORATION'S REPRESENTATIVE:** FUMC will be represented in this transaction by the attorney or representative named in paragraph number 14, above. FUMC shall approve each and every instrument, document, agreement, lease, survey, title requirement procedure, and certificate required to be furnished by Borrower by this commitment or as otherwise required by

FUMC. Such approval shall be as to both form and substance. The costs of FUMC's counsel, if any, shall be paid by the Borrower.

**30.  BORROWER'S COUNSEL OR REPRESENTATIVE:** You may retain legal representation or title insurance representation for yourself in order to assure you of proper representation at closing and during all phases of the construction. All disbursement checks will be released to the Borrower, or Borrower's agent or attorney, or the Lender's agent, as is customary in your area and as shall be satisfactory to FUMC, only upon satisfaction of standard closing practices customary in the area, including, without limitation, the completion of all steps necessary to secure the loan as a first lien on the premises, the receipt of original signed waivers of liens current to date of disbursement for work in place and materials supplied, an updated title insurance certification or endorsement, and such other materials as are customary in the geographical area of the mortgaged property for the protection of construction lenders. FUMC shall determine the actual requirements in each instance.

**31.  ZONING AND REGULATORY COMPLIANCE:** FUMC shall be furnished with evidence satisfactory to it that the property and proposed construction complies in all respects with zoning, environmental (including flood zone and wetlands), and all other governmental or administrative requirements or regulations. In some geographic regions and in some circumstances, FUMC may require title insurance coverage satisfactory to it in form and substance with respect to the foregoing and regarding such other matters incidental to the loan as it may require.
   Without limitation of the foregoing, the following may be required to be submitted to FUMC at least five (5) business days prior to closing, if FUMC deems necessary and requests the same:
A. A copy of final zoning and/or planning approval for the proposed construction.
B. A copy of the building permit for the proposed construction.
C. A copy of any performance or completion bonds required by any agency or authority.
D. Copy of Final Plans and Specifications for the project which are signed and dated by Borrower and Contractor and identified as Final Plans for the project, or a Statement from the Borrower that the final plans and specifications for the construction have been delivered to the FUMC and that no changes have been made to the said plans and specifications.

**32.  FIRST LIEN:** In all cases, FUMC shall require that the Mortgage is a first and prior lien subject only to such exceptions as shall be approved by FUMC and that the Note, Mortgage, and all other required loan documents are properly executed and fully and completely valid, enforceable and effective according to their tenor, and that the rights of FUMC thereunder are fully enforceable, and undiminished. In addition, to the extent that such matters are not otherwise assured, FUMC may require assurance that the premises is served by all utilities necessary for residential occupancy and that the premises has unfettered and permanent access to a public highway.

**33.  LOAN DOCUMENTATION:** In any event, all mortgage documentation (i.e., note deed and any other documents executed in connection with the loan) shall be subject to satisfactory review by FUMC.

**34.  CONTRACTOR/BUILDER ACCEPTANCE:** The qualifications and capability of the Contractor/Builder to successfully complete the project are critical issues for the Lender. FUMC shall have the right to review the qualifications of the Contractor/Builder, and the Borrower agrees to obtain and supply all documentation required by FUMC including, but not limited to, the Contractor/Builders resume, credit references and such other documentation references or reports as FUMC shall deem necessary to accomplish such review. The Borrower expressly agrees and acknowledges that the review of the Contractor / Builder is undertaken by FUMC solely for its own uses and that nothing in this Commitment Letter, or in the review of the Contractor / Builder, or in the making of loan advances hereunder, shall be deemed to give rise to any representation of quality, assurance, warranty or endorsement of any kind, of the Contractor / Builder by FUMC

**35.  CONTRACTOR'S AGREEMENT:** FUMC may require an agreement by the Contractor of the

proposed building and improvements, in form and substance acceptable to FUMC, agreeing that such Contractor will continue performance under its agreement with Borrower in the event of Borrower's default, if FUMC requests such performance and provided that Contractor is compensated for all work performed by it after such direction by FUMC.  FUMC shall have the discretion to choose to continue or not to continue with the completion of construction in the event of Borrower's default.

**35.  PLANS AND SPECIFICATIONS OF PROPOSED CONSTRUCTION:**  All plans and specifications, construction drawing and proposed cost breakdown, for construction of building and improvements shall be submitted to FUMC for review at least ten (10) business days prior to closing, subject to satisfactory review by FUMC.

**37.  NO ADVERSE CHANGE:**  This Commitment is issued in reliance on the facts stated in the Borrower's application, on the Borrower's financial statement, and that of its principals and guarantors, as set forth in the loan application and other information which the Borrower has submitted to FUMC, and in reliance on statements as to the value of the real property which is to secure the loan, its character and intended usage, all of which are deemed material.  Any misrepresentation of a material fact, whether intentional or otherwise, made prior to the issuance of this Commitment, and any change of any material fact which occurs prior to closing, conversion or modification to permanent financing, whether previously known and discovered or not, shall render this Commitment void without any further notice to the Borrower.  In such event, FUMC, at its option, may elect not to close the loan, or if the loan has been closed, will not be required to advance any additional funds;  the loan will be accelerated with the entire balance being immediately due and payable, and FUMC shall be entitled to retain all the monies it has received in connection therewith.

**38.  SPECIAL CONDITIONS:**  The following special conditions must also be satisfied.

SEE ATTACHED

**39.  ARBITRATION:**  Any controversy or claim arising out of or relating to the origination, processing, underwriting and/or closing of your mortgage loan, including without limitation any disclosures and/or mortgage loan documents or claims under the Truth in Lending Act and/or Real Estate Settlement Procedures Act, or any breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with the arbitration Rules, and judgement on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  Such arbitration shall take place in the City of Jacksonville, Florida.  This provision applies only to claims related to the origination, processing, underwriting and closing of the mortgage loan and its documents and disclosures; it does not pertain to the foreclosure of the mortgaged property or the acceleration of the mortgage Note under the term of Mortgage or Deed of Trust and/or Note by FUMC as a lender and/or its successor and assigns.

Signed:  *Carolyn Ipoe*   8/1/81

**FIRST UNION MORTGAGE CORPORATION**

BY:  *Martha Wyick*

t

First Union Mortgage Corporation
GOLDEN ONE ™  Construction /Permanent Loan Commitment Letter - Massachusetts

The foregoing Commitment Letter has been read and understood and is hereby agreed to and accepted by the undersigned this ____/____ day of _August_, 200_/.

Carolyn Igoe
_____          _____
Borrower                                                      Borrower

(In order to accept the commitment letter, all Borrowers must sign above and return the signed original to FUMC.)

Jul-31-01  04:10pm  From-WHOLESALE CONSTRUCTION          +8664389289        T-275  P.10/13  F-392

### ADDENDUM TO COMMITMENT LETTER - MASSACHUSETTS

### NON-CONVERSION, NON-DELIVERY & PRE-PAYMENT PENALTY

**THIS ADDENDUM WILL ADD A PRE-PAYMENT PENALTY TO THE LOAN WHICH WILL REMAIN IN EFFECT DURING CONSTRUCTION AND UNTIL YOUR THIRD MONTHLY PAYMENT OF PRINCIPAL AND INTEREST IS DUE.**

**Name of Borrower:**          Carolyn Igoe

By signing this Addendum to Commitment Letter the Borrower expressly agrees that the following provisions shall be added to the terms thereof in place of section 11, which shall be deleted and replaced with the following new section 11 and section 11A. The terms hereof shall apply in case of any inconsistent terms or provisions contained in any other part or section of said commitment letter.

**11.  No Prepayment Penalty After Conversion And Delivery:**  Beginning on the 1st day of the 4th month after the conversion of the loan to the Amortization Period (and the completion of all of Borrower's obligations in regard to the conversion to amortization), the loan shall contain no prepayment penalty.  Until that time  the loan shall contain a prepayment penalty in the form of an additional service charge which will be imposed in case of non-conversion, non-delivery or early prepayment, as described below.

**11A.  Additional Service Charge On Failure To Convert, Failure To Deliver or Early Prepayment.**  Notwithstanding anything in this agreement to the contrary, it is understood and agreed that the Borrower will pay to the Lender an additional service charge of  **2.00% of any full or partial pre-payment,** for services associated with any of the following:

> (1) the failure of the loan to fully convert to amortization as described in paragraphs 3, 4 and 5 of the commitment letter and in the loan documents for any reason; or
> (2) the failure of the Borrower to comply with any of the requirements of the Lender necessary to (i) complete disbursement of all of the proceeds under the Note and loan documents or (ii) to permit Lender to successfully deliver the loan for sale in the secondary mortgage market; or
> (3) the pre-payment of all or part of the outstanding loan balance before the 1st day of the 4th month after the conversion of the loan to the Amortization Period.

This service charge shall be separate from all other payments and charges due under the Note and loan documents, (e.g. extension fees, escrows and the like), and shall be required in addition thereto, if the loan does not convert to the Amortization Period, if successful delivery is not completed or if the loan is pre-paid in whole or in part before the 1st day of the 4th month after the conversion of the loan, all as above described.  **Conversion of less than the full loan amount shall be treated as a pre-payment of the amount not converted.**

**LENDER FORBEARANCE** - WITHOUT LIMITING THE RIGHTS OF THE LENDER TO IMPOSE THE CHARGES DESCRIBED IN PARAGRAPH 11 AND 11A ABOVE.  THE LENDER WILL AGREE TO PERMIT PARTIAL PRE-PAYMENT OF NOT MORE THAN A TOTAL OF 15% OF THE FULL LOAN AMOUNT (CONSIDERING ALL PRE-PAYMENTS MADE) WITHOUT IMPOSITION OF THE CHARGES DESCRIBED THEREIN.  IF PRE-PAYMENTS ARE MADE PRIOR TO THE 1ST DAY OF THE 4TH MONTH AFTER THE CONVERSION OF THE LOAN TO THE AMORTIZATION PERIOD, WHICH TOTAL MORE THAN 15% OF THE FULL LOAN AMOUNT, THE FEES DESCRIBED IN PARAGRAPH 11 AND 11A SHALL APPLY ON THE FULL AMOUNT PRE-PAID.

Signed:          **FIRST UNION MORTGAGE CORPORATION**

                 BY: *Martha Wyant*

The foregoing Addendum To Commitment Letter has been read and understood and is hereby agreed to and accepted by the undersigned this _____ day of _____, 200__.

*Carolyn Igoe*

_____          _____
Borrower                          Borrower

_____          _____
Borrower                          Borrower
(In order to accept the commitment letter, all Borrowers must sign above and return the signed original commitment letter
NON-CONVERSION, NON-DELIVERY & PRE-PAYMENT PENALTY - ADDENDUM TO COMMITMENT          990616MA

Jul-31-01  04:10pm   From-WHOLESAL~ ~NSTRUCTION              +8664399289        T-275  P.11/13  F-392

and the signed original of this Addendum To Commitment to FUMC.)

NON-CONVERSION, NON-DELIVERY & PRE-PAYMENT PENALTY - ADDENDUM TO COMMITMENT        990818MA

# CONSTRUCTION LOAN AGREEMENT

THIS AGREEMENT is made this    August 16, 2001    by and between

## CAROLYN IGOE    and

(the "Borrower"), and **FIRST UNION MORTGAGE CORPORATION**, with a place of business at 214 N. Hogan Street, 8th Floor, Jacksonville, FL 32202 (the "Lender").

WHEREAS, the Lender has granted a loan to the Borrower in the amount of $    260,100.00 on the lot(s) owned in fee simple by the borrower and more particularly described in a first Mortgage covering the premises and the materials, equipment and fixtures necessary for the construction of the Project (the "Security Instrument") of even date and recorded in the **Middlesex**    County Registry of Deeds; to wit

### 84 Madison Avenue, Everett, Massachusetts 02149

WHEREAS, Borrower has simultaneously executed and delivered to Lender a note of even date herewith in the principal amount of $    **TWO HUNDRED SIXTY THOUSAND ONE HUNDRED & 00/100's    DOLLARS ($    260,100.00    )** (the "Note") to evidence the indebtedness of Borrower for all money borrowed hereunder, and as security therefor and for the performance of Borrower's obligations under this Agreement has also executed or arranged for the execution of a Security Instrument, among other documents;

WHEREAS, the loan of $    260,100.00    granted by the Lender to the Borrower was made for the purposes of enabling the Borrower to improve the above-described property; and

WHEREAS, in order to give effect to the intention of the parties and the purposes for which the loan was given, the parties hereto have executed this Agreement.

NOW, THEREFORE, THIS AGREEMENT WITNESSETH: That in consideration for periodic advance of the proceeds of the Note in accordance with the terms of this Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Borrower covenants and agrees with the Lender as follows:

REPRESENTATIONS AND WARRANTIES

A.  All instruments (collectively, "the Basic Instruments"), including but not limited to, the Note, the Security Instrument, the Personal Financial Statements and all other loan documents or instruments have been validly executed, are now binding on the parties thereto and in full force and effect and Borrower has faithfully performed all their obligations thereunder to the extent accrued as of the date hereof, and none of said other parties has asserted any claim of default on the part of Borrower or any Guarantor.

B.  Borrower is the owner of the Premises free of all encumbrances except as indicated on the title insurance policy delivered to the Lender, with full power and authority to consummate the transaction contemplated hereby.

C.  The Borrower has duly executed and delivered this Agreement and all documents referred to herein, or delivered heretofore or herewith, and all necessary action has been taken by Borrower to authorize the execution and delivery hereof and thereof.

D. The execution and performance of this Agreement and the consummation of the transactions hereby contemplated will not result in any breach of, or constitute a default under, any mortgage, lease, bank loan or credit agreement, trust indenture, or other instrument to which Borrower is a party or by which Borrower may be bound or affected; none of the Basic Instruments and no other instruments to which Borrower is a party imposes or will impose on Borrower any obligations which are or will be inconsistent with any other obligations imposed on Borrower under any of the Basic Instruments or any other instruments heretofore or hereafter delivered.

E. There are no actions, suits or proceedings (including, without limitation, any condemnation proceeding) pending or threatened against or affecting the Borrower or the Premises or which may involve or affect the validity, enforceability or punctual performance of this Agreement, at law or in equity, or before or by any governmental authority, and the Borrower is not in default with respect to any order, writ, injunction, decree or demand of any court or any governmental authority, regarding the project.

F. The copies of the plans and specifications submitted with the loan application ("Plans and Specifications") are true and correct, are satisfactory to Borrower and have been approved by all governmental authorities having or claiming jurisdiction of the Premises or the Project. The construction and use of the Premises for the Project does not and shall not constitute a violation of any applicable laws, ordinances, orders, rules or regulations.

G. No person, firm or corporation has performed any construction work or furnished services in connection with any construction carried on or to be carried on at the Premises who or which has rendered a bill for the same which remains unpaid at the time of execution of this Agreement.

H. All utility services necessary for the construction of the Project and the operation thereof are available at the boundaries of the Premises, including water supply, storm and sanitary sewer facilities, gas, electric and telephone facilities, and all roads necessary for the full utilization of the Project have either been completed or the necessary rights of way thereof have either been acquired by the appropriate governmental authority exercising jurisdiction thereover or have been dedicated to public use and accepted by such governmental authority and all necessary steps have been taken by Borrower and any such governmental authority to assure the complete construction and installation thereof.

All statements contained in any certificate or other instrument delivered by Borrower or any Guarantor under this Agreement shall constitute representations and warranties made by Borrower or such Guarantor hereunder.

1. FUNDS DUE BORROWER:  The sum of      TWO HUNDRED SIXTY THOUSAND ONE HUNDRED & 00/100's      DOLLARS ($      260,100.00      ), the loan made by the Lender to the borrower and secured by the Note and Security Instrument of even date from the borrower, is to be held by Lender under the terms of the Commitment Letter signed by the Borrower.

2. DISBURSEMENTS:      Disbursements for the project are to be made at the discretion of the Lender, when construction of the improvements herein agreed to be constructed reach the stages of completion to be designated in this paragraph, upon inspection in each instance by the Lender in accordance with the Construction Advance Schedule, and incorporated herein by reference.

Disbursements can be withheld or refused by the Lender after inspection at any stage of construction, if the work required to be done has not been done to the satisfaction of the Lender. It is further agreed that the Lender may alter disbursements from the Schedule, at its discretion.

Upon the making of each advance and as a condition to making the advance, Borrower will: (a) execute a dated receipt for the amount advanced, which receipt may be endorsed upon or attached to the Note, or may be separate therefrom; and (b) deliver to Lender any written verified statements of Borrower and proofs of payment to contractor, subcontractors, laborers, and materialmen, as the Lender may demand.

3. DEDUCTION FROM DISBURSEMENTS:    The Lender may deduct from any disbursements to be made under this agreement any amount necessary for the payment of fees, charges, and expenses incurred in the procuring, making, administration of, and protecting of the Lender's security in the loan. All sums so applied shall be deemed disbursements under this agreement and secured by the Note and Security Instrument.

4. PLANS, MATERIALS, PERMITS:    The improvements erected on the property shall be in accordance with the plans and specifications submitted with the loan application. All materials, specifications, and workmanship shall meet or exceed the standards imposed by all applicable Building Codes of the governing authority where the property is located. Before the making of the first disbursement hereunder, the Borrower shall file the plans and specifications with all governmental authorities having jurisdiction and shall obtain all necessary approvals, permits, and licenses from the authorities. No changes shall be made to the plans and specification without prior approval of the Lender, in writing.

5. INSURANCE:    The Borrower or their contractor shall provide Builder's Risk Insurance and Public Liability and Workman's Compensation Insurance for the proposed construction in companies, forms and amounts satisfactory to Lender.

6. SURVEYS AND TITLE REPORTS:    Borrower shall furnish to Lender or Lender may procure at the Borrower's expense, surveys and continuations of surveys made by a surveyor satisfactory to Lender and title continuations whenever required.

7. DEFINITION OF COMPLETION:    For purposes of this Agreement, construction of the building shall be deemed completed only when:

(a) An architect, engineer, or inspector approved by Lender shall certify to Lender in writing that the physical construction of the building has been completed in strict accordance with the plans and specifications, as they may have been amended and supplemented with Lender's written approval and that of any governmental authorities having jurisdiction, all utilities serving the building have been connected and are operating, and the building is ready for occupancy for the purposes for which designed;

(b) A final certificate of occupancy has been issued for the building by the governmental authorities having jurisdiction authorizing its use for the purposes for which designated; and

8. BREACH:    The Borrower covenants and agrees not to do any act or thing prohibited by the terms of this Agreement, and it is expressly agreed that in any of the following events all obligation on the part of the Lender to make the loan or to make any further disbursement shall, if the Lender so elects, cease and terminate, and the Note and Security Instrument shall, at the option of Lender, become immediately due and payable, but the Lender may make any disbursement on part thereof after the happening of any of the following events, each of which shall constitute an event of default by the Borrower hereunder, without thereby waiving the right to demand payment of the debt and without becoming liable to make any other or further disbursement:

(a) If the Borrower fails to start construction within two months from the date of the Note and Security Instrument herein referred to, or have work stoppage for a fourteen day period:

First Union Mortgage Corporation                                                                        Page 3

(b) If the Borrower fails to complete the building on or before    **March 1, 2002**    or the final day of any extension of the construction period granted in writing by the Lender;

(c) If the Borrower fails to keep, observe, or perform any of the conditions, stipulations, agreements, or covenants contained in this Agreement or in the Note or Security Instrument;

(d) If the Borrower does not construct the building in accordance with the plans and specifications and in accordance with all laws, rules, regulations, and requirements of all governmental authorities having jurisdiction, and in accordance with any amendments and additions to the plans and specifications made with the written approval of the Lender and any governmental authorities having jurisdiction; or if the Borrower fails to file amended or supplemental plans and specifications, if required, because of any such amendments and additions approved by the Lender and by any such governmental authorities;

(e) If the Borrower attempts to assign this agreement or any advances hereunder or any interest therein, or if the premises are conveyed or encumbered in any way without the written consent of the Lender. Any Assignment of this Agreement or the moneys due under this Agreement, made without Lender's consent, shall be void;

(f) If, at any time, the title is not satisfactory to the Lender's attorney, regardless of whether the lien, encumbrance, or other question existed at the time of any prior disbursement;

(g) If the Lender is not permitted to enter upon the premises and inspect the building at all reasonable times and examine all detailed plans and specifications which are kept at the work site; or if the Borrower fails to furnish the Lender, when requested, with copies of such plans and specifications;

(h) If the Borrower does not disclose to the Lender, upon demand, the names of all persons with whom the Borrower contracted or intends to contract for the construction of the building or the furnishing of labor or material therefor;

(i) If the Borrower permits any person, purchaser or prospective purchaser to occupy the premises before this agreement shall have been fully performed and the final disbursement made hereunder;

(j) If the Borrower permits or omits any act or thing that may, in the judgment of the Lender, jeopardize the security herein.

9. REMEDIES:    It is agreed that the Lender, upon a breach, act or omission, by the Borrower, as aforesaid, without any notice to the Borrower, is authorized to take such action as it deems necessary to protect its interests, notwithstanding any provision contained in this Agreement or the Note or Security Instrument mentioned herein. Any waiver by the Lender of a default or breach on the part of the Borrower shall not in any case of further default by the Borrower, prevent or stop the Lender from proceeding as herein provided. The Borrower hereby agrees to be liable for all expenses, including reasonable attorney's fees and other necessary expenses incident to action taken by the Lender pursuant hereto. None of the rights herein conferred upon the Lender shall, in any manner, affect or interfere with the legal remedies under the provisions of the Note and Security Instrument.

10. LIENS:    It is understood and agreed that the Lender has no responsibility to the Borrower should mechanics liens or any other lien or encumbrance develop on this property.

11. LIABILITY:     It is understood between the parties hereto that the Borrower has selected all architects, engineers, contractors, subcontractors, materialmen, as well as all others furnishing services or materials to the construction project and the Lender has, and shall have, no responsibility whatsoever for them or for the quality of their materials or workmanship, it being understood that the only consideration passing from the Lender to the Borrower is the loan proceeds in accordance with and subject to the terms of this agreement and the Committment Letter signed by the Borrower.  It is also agreed that the Borrower shall have no right to rely on any procedures required by the Lender herein, such procedures being for the protection of the Lender and no one else.  Borrower hereby agrees to hold and save the Lender harmless and indemnify it against and from claims, of any kind, of any persons, including but without limiting the generality of the foregoing, employees of the Borrower, any contractor constructing the improvements and the employees of any such contractor, any tenant of the Borrower, any subtenant or concessionaire of any subtenant or concessionaire, arising from or out of the construction, use, occupancy, or possession of the improvements in accordance with the plans and specifications.

12. EXTENSION:     The Lender may, at any time, extend, within regulatory limits, the construction period or payment of the indebtedness secured by the Note and Security Instrument, and any extension so granted shall be deemed made pursuant to this Agreement.

13. ASSIGNMENT:  The Lender may assign this Agreement and the Note and Security Instrument and cause the assignee or any subsequent assignee to make any disbursements not made at the time of the assignment, and all the provisions of this Agreement shall continue to apply to the loan and the Note and Security Instrument.

14. ENFORCEABILTY:     In the event any part of this Agreement is held to be unenforceable to void, such fact shall not affect the enforceability or validity of the remaining parts hereof.

15. JOINT AND SEVERAL LIABILITY:     Although reference to Borrower is in the singular throughout, if there are two or more persons, corporations, or other entities as Borrowers, their obligations herein shall be joint and several and a breach or violation hereof by any one of them shall constitute a breach or violation by all of such Borrowers.

16. CAPTIONS:     The captions herein are inserted only as a matter of convenience and for reference, and in no way define, limit or describe the scope of this Agreement nor the intent of any provision hereof.

17. BINDING EFFECT:     This Agreement shall be binding upon and inure to the benefit of the respective parties hereto, their successors and assigns.

Executed as an instrument under seal this     **August 16, 2001**   .

ATTEST:

_____          _____
                                           CAROLYN  IGOE

_____          _____


## COMMONWEALTH OF MASSACHUSETTS

         Middlesex     , ss:                      August 16          , 200 1

On this ___16th__ day of __August_____, 200 1, before me personally appeared
___Carolyn Igoe_____, to me known to be the person described in and
who executed the foregoing instrument, and acknowledged that ___she___ executed the same as
___her_____ free act and deed.

                                            _____
         James J. Burke                     Notary Public
         NOTARY PUBLIC                       My Commission Expires: 2/ 16/ 7
         My commission expires Feb. 16, 2007


                              FIRST UNION MORTGAGE CORPORATION

_____          BY:_____
witness                                    Evelyn Andress
                                           Its Vice President

_____
witness


STATE OF FLORIDA               )
COUNTY OF DUVAL                ) ss: Jacksonville                    , 200__

On this _____ day of _____, 200__ before me appeared Evelyn Andress,
who being duly sworn acknowledged that the foregoing instrument was signed and sealed on
behalf of FIRST UNION MORTGAGE CORPORATION, by authority of its board of directors
and that said acknowledged the foregoing to be the free act and deed of the Corporation.

                              _____
                              Notary Public
                              My Commission Expires:



| B104 (Rev. 2/92) | **ADVERSARY PROCEEDING COVER SHEET** (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court) |

IN CLERK'S OFFICE

| **PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| Carolyn Igoe<br>7 Porter St.<br>Revere Ma. 02151 | Raymond Peveri<br>4 Pevwell Drive<br>Saugus. Ma. 01906 |

2004 APR 27 A 11: 59

BANKRUPTCY COURT
DISTRICT OF MASS

| **ATTORNEYS** (Firm Name, Address, and Telephone No.) | **ATTORNEYS** (If Known) |
|---|---|
| John H. Molloy, Esq<br>Law Office of John H. Molloy<br>385 Broadway, Revere Ma. 02151 | Earl D. Munroe, Esq<br>27 Congress St.<br>Salem. Ma. 01970 |

**PARTY** (Check one box only)    □ 1 U.S. PLAINTIFF    □ 2 U.S. DEFENDANT    □ 3 U.S. NOT A PARTY

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Complaint by creditor seeking Determination of Dischargeability of a Debt, 11 USC s.523.

**NATURE OF SUIT**
(Check the one most appropriate box only.)

□ 454 To recover money or property

□ 435 To determine validity, priority, or extent of a lien or other interest in property

□ 458 To obtain approval for the sale of both the interest of the estate and of a co-owner in property

□ 424 To object or to revoke a discharge 11 U.S.C. § 727

□ 455 To revoke an order of confirmation of a Chap. 11, Chap. 12, or Chap. 13 Plan

☒ 426 To determine the dischargeability of a debt 11 U.S.C. § 523

□ 434 To obtain an injunction or other equitable relief

□ 457 To subordinate any allowed claim or interest except where such subordination is provided in a plan

□ 456 To obtain a declaratory judgment relating to any of the foregoing causes of action

□ 459 To determine a claim or cause of action removed to a bankruptcy court

□ 498 Other (specify)

| **ORIGIN OF PROCEEDINGS** (Check one box only.) | ☒ 1 Original Proceeding | □ 2 Removed Proceeding | □ 4 Reinstated or Reopened | □ 5 Transferred from Another Bankruptcy Court | □ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 |

| **DEMAND** | NEAREST THOUSAND $ 225,000.00 | OTHER RELIEF SOUGHT | ☒ JURY DEMAND |

**BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES**

| NAME OF DEBTOR    Raymond Peveri | BANKRUPTCY CASE NO.    04-10782 |
|---|---|

| DISTRICT IN WHICH CASE IS PENDING    Massachusetts | DIVISIONAL OFFICE | NAME OF JUDGE |

**RELATED ADVERSARY PROCEEDING (IF ANY)**

| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
|---|---|---|

| DISTRICT | DIVISIONAL OFFICE | NAME OF JUDGE |

| FILING FEE    (Check one box only.) | ☒ FEE ATTACHED | □ FEE NOT REQUIRED | □ FEE IS DEFERRED |

| DATE    4/23/04 | PRINT NAME    John H. Molloy | SIGNATURE OF ATTORNEY (OR PLAINTIFF) |

# JOHN H. MOLLOY
## ATTORNEY AT LAW

385 Broadway, Suite 402
Revere, Massachusetts 02151
Telephone: (781) 284-9934
Facsimile: (781) 284-5301

3353 Washington Street
Jamaica Plain, Massachusetts 02130
Telephone: (617) 522-9701
Facsimile: (617) 522-9703

\* Please direct all correspondence to Revere office

April 23, 2004

United States Bankruptcy Court
1101 Thomas P. O'Neill Federal Office Bldg.
10 Causeway Street
Boston, MA  02222-1074

RE:   Carolyn Igoe v. Raymond J. Peveri
      Case No.: 04-10782-WC11

Dear Sir or Madam:

**Filing Fee Paid**

Enclosed for filing/Docketing please find the following:

1.   REQUEST FOR DETERMINATION OF DISCHARGEABILITY OF DEBT;
2.   FILING FEE $150.00;
3.   ADVERSARY PROCEEDING COVER SHEET; and
4.   CERTIFICATE OF SERVICE.

Kindly notify this office when a hearing relative to this matter will be assigned. Thank you for your attention to this matter.

Very truly yours,

John H. Molloy

JHM/yo
Enclosures

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE

CASE NO.: 04-10782-WCIT 2004 APR 27 A II: 58

U.S. BANKRUPTCY COURT
DISTRICT OF MASS

CAROLYN IGOE
      Plaintiff

v.

RAYMOND J. PEVERI
      Defendant



Filing Fee Paid

REQUEST FOR DETERMINATION OF DISCHARGEABILITY OF DEBT

PARTIES

1.    Carolyn Igoe, hereinafter "plaintiff Igoe" is an individual residing at 7 Porter
      Street, Revere, Suffolk County, Massachusetts.

2.    Raymond J. Peveri, hereinafter "defendant Peveri" is an individual residing at 4
      Pevwell Drive, Saugus, Essex County, Massachusetts.

PROCEDURAL HISTORY

3.    Defendant Peveri filed a Chapter Seven Petition in the United States Bankruptcy
      Court in the District of Massachusetts on or about February 10, 2004 through his
      counsel, Earl D. Munroe, Munroe & Chew, 27 Congress Street, Salem,
      Massachusetts.

4.    Herewith, plaintiff Igoe is filing this Request for Determination of
      Dischargeability of Debt.

5.    On or about April 2, 2001, the plaintiff Igoe paid to defendant Peveri a deposit in
      the amount of $5,000.00 to facilitate the construction of a pre-fabricated home on
      a parcel of land plaintiff Igoe owned located at 88-90 Madison Avenue, Everett,
      Massachusetts.

6.    On or about May 23, 2001, plaintiff Igoe and defendant Peveri entered into a
      contract whereby plaintiff Igoe would purchase a pre-fabricated home from
      defendant Peveri and defendant Peveri would cause said home to become finished
      pursuant to all local and state building codes and regulations. (Exhibit A).

7.  On or about August 22, 2001, plaintiff Igoe paid to defendant Peveri further funds as deposit in the amount of $20,700.00.

FILED
IN CLERKS OFFICE

2004 APR 27 A 11: 59

U.S. BANKRUPTCY COURT
DISTRICT OF MASS

8.  On or about June 6, 2002, $15,400.00 was paid by plaintiff Igoe to defendant Peveri to construct a foundation for the home.

9.  On or about June 6, 2002, $5,400.00 was paid by plaintiff Igoe to defendant Peveri to construct garages and upgrade kitchen cabinets.

10. On or about June 21, 2002, $109,277.00 was paid to defendant Peveri to complete construction at the home site.

11. Defendant Peveri constructed the foundation and garages contracted for, however, these were constructed with substandard materials and below industry standards for craftsmanship.

12. On or about June 25, 2002, defendant Peveri left the work site and failed to return to complete the work contracted and paid for by plaintiff Igoe.

13. Plaintiff Igoe was caused to expend $43,345.41 in interest and extension fees as a direct result of defendant Peveri's failure to perform pursuant to the terms of the contract executed by and between plaintiff Igoe and defendant Peveri.

14. Plaintiff Igoe was caused to expend additional funds in the amount of $24,500.00 to various general contractors to correct inadequate and defective workmanship in the work actually performed by defendant Peveri.

## COUNT 1

15. The plaintiff restates and reasserts paragraphs 1-14 above.

16. The defendant, Raymond J. Peveri, has breached the terms of the written agreement between the plaintiff and the defendant dated August 1, 2001 by failing to construct a dwelling at 88-90 Madison Avenue, Everett, Middlesex County, Massachusetts.

WHEREFORE, the plaintiff demands:
Judgment in the amount of $223,622.41 against the defendant, Raymond J. Peveri for his breach of the written contract plus costs and attorney's fees.

## COUNT 2

17. The plaintiff restates and reasserts paragraphs 1-16 above.

18.    The defendant, Raymond J. Peveri, by his actions has been unjustly enriched to the detriment of the plaintiff.

FILED
IN CLERK'S OFFICE

2004 APR 27  A 11: 59

U.S. BANKRUPTCY COURT
DISTRICT OF MASS

WHEREFORE, the plaintiff demands:
     Judgment against the defendant by reason of his unjust enrichment due to his actions against the plaintiff in the amount of $155,777.00 plus costs and attorney's fees and such other further relief as this Honorable Court deems meet and just.

                              Carolyn Igoe
                              By her attorney


                              _____

                              John H. Molloy
                              385 Broadway, Suite 402
                              Revere, MA  02151
                              (781) 284-9934
                              BBO #:  600778


Dated:  April 25, 2004



Exhibit "A"

# CHAMPION HOMES USA

## *SIMPLY THE BEST*

### *SALES AGREEMENT & DEPOSIT RECEIPT*

This Agreement made this 23ᴿᴰ day of _MAY, 2001_ between Champion Homes _I RVP_
USA hereinafter known as the CONTRACTOR, and _Carolyn Igoe_
_3 Porter Ave_ of _Revere MA 02151_ hereinafter known as the
PURCHASER.

### *THE FOLLOWING WORK TO BE DONE BY THE CONTRACTOR*
*Basic Price    $ 175,000.ˣˣ*

| Factory ADDITIONS | | Extra Work CONTRACTOR | |
|---|---|---|---|
| Delivery | | First Total | 175,000.ˣˣ |
| Crane | | CONTRACTOR Extras | |
| Total | 175,000.ˣˣ | Second Total | |
| | | Sales Tax | 1,365.ˣˣ |
| | | GRAND TOTAL | 176,365.ˣˣ |
| | | Down Payment Received | 5,000.ˣˣ |
| | | BALANCE DUE | 171,365.ˣˣ |

The Undersigned Champion Homes USA hereinafter referred to as the CONTRACTOR
agrees to sell and by these presents does sell, subject to the conditions herein described as
PURCHASER, agrees to buy Champion Homes USA as computed above, for the Grand
Total as designated above: Plans, Specifications, Order Analysis and Responsibilities of
PURCHASER in the hands of both parties to this Agreement, hereby incorporated into
this Sales Agreement by reference. The PURCHASER agrees to pay per the following
payment schedule (see attached payment schedule sheet for a more detailed explanation).

| 15% | Deposit | 26,150.ˣˣ less 5,000.ˣˣ = 21,150 |
|---|---|---|
| 10% | Foundation Complete | 17,636.ˣˣ |
| 55% | House Delivery | 97,000.ˣˣ |
| 10% | Button-Up Complete | 17,636.ˣˣ |
| 5% | Plaster & Paint | 8,828.ˣˣ |
| 5% | Carpet & Occupancy | 8,815.ˣˣ |

CERTIFICATE OF SERVICE

I, John H. Molloy Esq., certify that I mailed a copy of Plaintiff's Complaint for Request for Determination of Dischargeability of Debt to be served upon counsel for defendant by mailing same postage prepaid, first class mail, this 23rd day of April 2004.

_____
John H. Molloy

FILED
IN CLERK'S OFFICE
2004 APR 27  A 11: 59
U.S. BANKRUPTCY COURT
DISTRICT OF MASS



**FUMC**

**Three Part Modular Funding**
**Schedule**

LOAN NO: *7289805-00*

Borrower(s) *IGOE, CAROLYN*

Contractor: *Champion Homes*
Property
Address: *87 Madison Ave*
*Everett, MA*

| | | | | | |
|---|---|---|---|---|---|
| 1. | 15% | Footings, piers & foundation walls, waterproofing complete, including garage foundation if applicable, lot clearing, excavation, back-fill, temp elec.<br>If Concrete slab: Slab complete.<br>If Crawl space: Floor joists & sub floor complete.<br>Municipal approval if applicable.<br><br>Foundation survey with flood certification is required for disbursement of first draw. If property is located within flood zone which requires flood insurance, proof of such must be furnished prior to disbursement of first draw. <u>No draws will be disbursed without Builders Risk Insurance.</u> | $ *26,455*<br>$ _____<br>Date _____<br>Ck # _____ | $_____<br>to be paid by<br>borrower<br>funds (includes<br>deposits) |
| 2. | 60% | Delivery and set Modular Unit(s) on foundation<br>House weather tight and lockable as of set.<br>Municipal approval if applicable. | $ *105,819*<br>$ _____<br>Date _____<br>Ck # _____ | $_____<br>to be paid by<br>borrower funds<br>(includes deposits) |
| 3. | 25% | All mechanical systems full operational<br>Electrical fixtures hung and connected<br>All plumbing, septic or municipal connection complete and town approved<br>Interior/Exterior paint and stain<br>Walks and drives<br>Interior flooring complete<br>All decks, steps, porches, interior and exterior stairs complete<br>Seed and final grade<br>Re-Cert of Value by Appraiser<br>All work finished and satisfactory to the Bank. House should be ready for Occupancy including clean-up. Certificate of Occupancy required.<br>Four (4) Original final surveys with flood certification and proof of homeowner insurance and flood insurance (if required) for disbursement of final draw. | $ *44,091*<br>$ _____<br>Date _____<br>Ck # _____ | $_____<br>to be paid by<br>borrower funds<br>(includes deposits) |

TOTAL DRAWS: $ *176,365*

Date
Contractor
Signature: _____

Borrower Signature: _____

Borrower Signature: _____

**FUMC INTERNAL USE ONLY**

| | | |
|---|---|---|
| Land or Payoff: | $ _____ | $ _____ |
| Borrower Funding: | $ _____ | $ _____ |
| FUMC Funding: | $ _____ | $ _____ |
| Closing Costs: | $ _____ | $ _____ |
| Deposits: | $ _____ | $ _____ |
| | | 4/16/99 |

47